(No. 23283.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* VINCENT GUAGLIATA, Plaintiff in Error.

*Opinion filed February 14, 1936.*

RYAN & HOOD, (BERNARD P. BARASA, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, ROBERT E. NASH, State's Attorney, A. B. DENNIS, and MAX A. WESTON, for the People.

Mr. JUSTICE HERRICK delivered the opinion of the court:

Dr. Vincent Guagliata (hereinafter referred to as the defendant) was indicted for selling a narcotic drug in violation of the provisions of the Narcotic Drug Control law, in force July 3, 1931. In a trial before a jury in the circuit court of Winnebago county, beginning on July 8, 1935, the jury returned a verdict finding him guilty and fixed his punishment at one year in the penitentiary. There was a judgment on the verdict. The defendant brings the case here for review.

The defendant contends that the evidence is not sufficient to sustain the verdict of conviction. A review of the evidence therefore becomes necessary.

The record shows the defendant was a duly licensed physician and pharmacist in the city of Rockford, where he

operated a drug store. On April 10, 1934, Bennie Cromartie purchased from the defendant at his store thirteen morphine tablets and on the 12th eight more, each tablet containing approximately one-quarter grain of morphine. No prescription was written by the defendant covering the sale of any of these tablets. The vial or package containing the tablets was in neither instance labeled and showed thereon no directions as to how the contents should be taken.

The prosecuting witness testified that he had been buying morphine tablets from the defendant regularly for three or four months prior to April 10, sometimes twice a day and some days none; that the defendant had never on any occasion made any examination of him; that in making his purchases the witness had informed the defendant he was getting the tablets for his wife, who was a drug addict and whom the defendant had never seen; that he informed police officers Phelan and Johnson that he could buy drugs from the defendant; that on the evening of April 10 these officers met him, searched him and his car for narcotics but found none, then gave him three dollars with which to buy narcotics; that he then entered the defendant's store, inquired if he could let him have three dollars' worth of the one-quarter-grain morphine tablets; that the doctor went to the rear, brought out a vial containing the tablets, which he gave Cromartie, who paid him three dollars therefor. A few minutes later he handed this vial to officer Johnson. Again, on the night of the 12th, Cromartie, by appointment, met the officers in the presence of Ray Degan, of the Federal narcotic bureau. Cromartie and his car were thoroughly searched by them without finding any narcotics. Cromartie was then given two one-dollar bills, after the officers had made a memorandum of the serial numbers thereof. He took the bills with the understanding that he was to purchase more of the morphine tablets from the defendant. Cromartie then went to the defendant's

store and asked him for another dollar's worth of the tablets. The defendant handed him eight tablets wrapped in a paper package and received from him a one-dollar bill. The package was turned over by Cromartie to the officers, who were waiting outside. They then entered the defendant's store and arrested him. Degan asked to see the defendant's money, and in it found one of the bills which had been given Cromartie a few minutes before.

The officers testified that when arrested the defendant became very excited and began searching his desk for a gun, whereupon they grabbed his arms. Officers Phelan and Johnson corroborated the testimony of Cromartie regarding the search of his person and car on the two occasions and the handing of the money to Cromartie. They further testified they were on the street opposite the defendant's store when Cromartie entered it on the night of April 10, saw him talk to the defendant, after which the defendant went to the rear of the store, returned a minute or two later and handed Cromartie a small package.

The defendant was taken to the police station about 7:30 on the night of his arrest. About 1:40 A. M. that night, after being informed of his constitutional rights, he was questioned by the assistant State's attorney who tried the case, and the questions and the defendant's answers were taken down by a stenographer. Without objection to its competency the stenographer read from the transcript of her shorthand notes portions of the defendant's statement, to the effect that the defendant said he had always refused to sell to Cromartie before the 10th; that about 6:00 or 6:30 that day he sold him twenty-four grains for three dollars, with the understanding that Cromartie would fix his car; that on the 12th Cromartie had taken the doctor's car to his place, returned later, and the doctor then, because Cromartie said he could not purchase morphine from his regular man, sold him eight more quarter-grain-tablets for one dollar; that the defendant knew Cromartie

did not have a prescription, and he made no examination of him because he said the drug was for his wife.

Dr. John W. Fonner, a chemist, testified he had examined the tablets in question; that they contained pure morphine crystals; that each tablet weighed about one-half grain and each contained one-quarter grain of morphine.

The defendant testified in his own behalf; denied that he knew Cromartie prior to April 10 or had sold him any morphine prior to that date; stated that Cromartie came to his office that day complaining of illness, saying he had had the flu, was restless, could not sleep at night, asked the doctor if he could not do something for him; that he examined him in his private office, examined his pulse and heart, looked at his eyes and throat, listened to his heart with a stethoscope, and found that Cromartie had a murmur in the mitral valve; that the pulse was hard, explaining why Cromartie could not sleep; that he had a cough, was restless and shaky, complained during the examination that he had pains and aches all over; that the defendant then prepared twelve sedative tablets for him and informed him the examination would be two dollars and the tablets one dollar; that Cromartie said he would return later; that he returned that night with the money and the doctor handed him the vial containing the tablets. On the evening of April 12 Cromartie came in, stated he had lost the tablets, wanted a few more to make up for what he had lost, and that the defendant sold them to him without any further examination. He denied that Cromartie said the tablets were for his wife. Fifteen physicians testified to the good reputation of the defendant as a law-abiding citizen.

Cromartie, although contradicted in many particulars by the defendant, is corroborated in the essential details by the officers Phelan and Johnson. The statement made by the defendant on the night of his arrest was a virtual admission of his guilt. This court will reverse a conviction on

the evidence only when it is able to say, after careful consideration of the whole testimony, that there is clearly a reasonable and well-founded doubt of the guilt of the accused. Where the record discloses sufficient credible testimony and the verdict is not palpably contrary to the weight of the evidence this court will not substitute its judgment for that of the jury, who had the advantage of seeing and hearing the witnesses testify and were thus in a better position to determine the weight of the testimony and the credibility of the witnesses. *People* v. *Fortino,* 356 Ill. 415; *People* v. *Bolger,* 359 id. 58; *People* v. *Fitzpatrick,* 359 id. 363. ·

It is urged by the defendant that paragraph 3 of section 6 of the Narcotic Drug Control law, (Cahill's Stat. 1933, chap. 91, par. 139, p. 1825; Smith's Stat. 1933, chap. 38, par. 192-*f,* pp. 1027-28;) under which the defendant was tried, is unconstitutional, in that the act provides that "a physician, in good faith and in the course of his professional practice only, may prescribe, administer, or dispense habit-forming drugs;" that the words "good faith" have no common or generally accepted meaning, and therefore the act creates an offense in ambiguous and uncertain language. The words complained against have been defined in many cases in many jurisdictions. In *Crouch* v. *First Nat. Bank,* 156 Ill. 342, we said that "good faith" means "honest, lawful intent," and in *McConnel* v. *Street,* 17 Ill. 253, we said that "good faith" is "the opposite of fraud and bad faith." Numerous cases in other jurisdictions give substantially similar definitions. A liberal construction should be given constitutional provisions in order to sustain legislative enactments, and all doubts and uncertainties arising from the constitution, as well as the statute, should be resolved in favor of the validity of the statute. (*People* v. *McBride,* 234 Ill. 146.) The words "good faith," as used in paragraph 3, have a definite and well-understood meaning, are free from ambiguity, and their

use in the act does not violate the due process clause of the State or Federal constitution. *People* v. *Anderson,* 355 Ill. 289; *Amberson* v. *Amberson,* 349 id. 249.

The defendant next urges that the court, although requested, failed to give any instructions on the law of entrapment. In the recent case of *In re Horwitz,* 360 Ill. 313, we approved of what was said in *Sorrells* v. *United States,* 287 U. S. 435, 77 L. ed. 413, to the effect that while entrapment constitutes a valid defense if the officers of the law inspire, incite or lure the defendant to commit a crime which otherwise he had no intention of committing, yet officers may afford such opportunities for the commission of the crime and that artifice and stratagem may be used to catch those actually engaged in criminal enterprises. Here the officers did no affirmative act whatever to incite or persuade the defendant to sell the morphine, but they did, as they had the right to do, afford him an opportunity to violate the statute. The court, under the evidence, would not have been justified in giving the requested instruction.

It is urged also that paragraph 2 of section 5 of the act should be interpreted to include only those tablets containing more than one-fourth grain of morphine, thereby exempting any tablet containing one-fourth grain or less of morphine. Section 5 of the act provides that "the provisions of this act shall not apply to: * * * (2) Preparations, prescriptions and remedies which do not contain * * * more than one-fourth of a grain of morphine * * * in one avoirdupois ounce." In our opinion the paragraph in question clearly limits the exemption to one-fourth of a grain of morphine in one avoirdupois ounce. Without such construction the reference to avoirdupois ounce would have to be emasculated from the sentence, when, in fact, it is clearly and necessarily a limitation upon the preceding words, "more than one-fourth of a grain of morphine."

The Narcotic Drug Control act of July 3, 1931, under which the defendant was tried and sentenced, was repealed July 8, 1935, and on the same day the Uniform Narcotic Drug act, the provisions of which are substantially the same as in the former act except as to the penalty imposed, became operative. (Laws of 1935, pp. 723-733.) It will be observed that the trial of the defendant began the very day that the 1931 act was repealed and the new act became effective. Section 4 of chapter 131 (Ill. State Bar Stat. 1935, p. 3052,) provides: "If any penalty * * * or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect," etc. It is asserted here, and not denied, that neither the trial judge nor any of the attorneys in the case knew at the time of the trial, or at the time the defendant was sentenced, on July 20, that the former Narcotic act had been repealed or the new act had become effective.

The defendant contends that if any sentence was to be pronounced on him he should have been given the opportunity to elect under which statute he would be sentenced, and that he was not afforded such chance. In support of his position he relies upon section 4 of the statute. The People reply that by not making such demand in the trial court he waived such right, and cite and rely on *Kossakowski* v. *People,* 177 Ill. 563. In that case the defendants were found guilty of embezzlement by a jury and their punishment fixed at three years in the penitentiary. The offense was committed prior to July 1, 1895. On that date the Indeterminate act, providing for the imposition of indeterminate sentences and for a system of parole, became effective. The defendants were tried almost three years after the Indeterminate act was in force. It was urged that the conviction, being for a fixed period, contravened the provisions of the Indeterminate act and was therefore illegal and void. The court there said: "The act so invoked

did not change the character of the punishment provided by the existing law, nor can it be said it inflicted a greater punishment than that provided by the prior law. The effect of the new act may have been to mitigate the punishment. When it is doubtful whether the penalties of a new law are more severe than under the prior law it has been declared the later act is not *ex post facto*, but the defendant shall be allowed to select which of the acts shall be applied to his case.—*Herbert* v. *State*, 7 Tex. 69; *Clarke* v. *State*, 23 Miss. 261; *McInterf* v. *State*, 20 Tex. App. 335." The court held that the procedure for punishment was governed by section 4, but that the defendants had waived the point because they made no objection in the trial court to the sentence being pronounced under the statute in force at the time the offense was committed.

The defendant directs our attention to *People* v. *Zito*, 237 Ill. 434, where this court, speaking through Mr. Chief Justice Cartwright, in discussing the effect in the changing of a criminal statute while a prosecution is pending under the earlier statute, said: "The punishment inflicted can not be increased by an amendatory or repealing act, which would bring it into conflict with the constitutional prohibition against *ex post facto* laws, (*Johnson* v. *People*, 173 Ill. 131,) but a defendant would be entitled to have the punishment fixed under the law as it stood at the time of the commission of the crime. If, however, any penalty, forfeiture or punishment be mitigated by any provisions of the new law, section 4 provides that with the consent of the party affected the provisions may be applied to any judgments pronounced after the new law takes effect."

It is obvious that the basis of the decision in the *Kossakowski case, supra,* was that the new law did not change the character or grade of the offense. The crime was a felony both under the former law and the Indeterminate act. That situation does not prevail here. By the act of July 8, 1935, *supra,* the crime is reduced for a first offense

from a felony to a misdemeanor, with a maximum fine of $1000, or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment.

The defendant was not given an opportunity to elect whether he would be sentenced under the act of July 8, 1935, rather than under the act of July 3, 1931. He was entitled to that privilege.

The judgment is reversed and the cause remanded to the circuit court of Winnebago county, with directions to afford the defendant the right to elect whether sentence shall be pronounced against him under the act of July 8, 1935, or the act of July 3, 1931, and thereupon the circuit court will pronounce proper sentence upon the defendant.

*Reversed and remanded, with directions.*