[Civ. No. 14839. First Dist., Div. One. Dec. 27, 1951.]

BARNARD DAVIS, Appellant, v. STATE BOARD OF MEDICAL EXAMINERS, Respondent.

Leslie C. Gillen for Appellant.

Edmund G. Brown, Attorney General, and J. Albert Hutchinson, Deputy Attorney General, for Respondent.

BRAY, J.—Respondent, after a hearing, revoked petitioner's license as a physician and surgeon. The superior court in a mandate proceeding, after reviewing the board's action, found that the findings and order of the latter were supported by the weight of the evidence, that the hearing was fair and regular, and that the peremptory writ of mandate should be denied. Petitioner appeals from the court's judgment.

### QUESTIONS PRESENTED

(1) Sufficiency of the evidence before the board and court, and (2) alleged abuse of discretion in the penalty imposed.

## FACTS

By stipulation the evidence presented to the board and reviewed by the superior court was the 728-page transcript of the proceedings in criminal action No. 41781, Superior Court of San Fráncisco, in *People* v. *Davis,* wherein petitioner had been charged with violation of section 11500 of the Health and Safety Code. The trial of that action resulted in a disagreement of the jury and the action was dismissed. After reading the transcript in the criminal action we feel that we cannot improve upon the statement of the facts set forth in the memorandum opinion of the Honorable Preston Devine, the judge who heard the mandate proceeding. That statement, in part, is as follows:

"3. *It is contended that the findings are not supported by the weight of the evidence.*

"The facts may be stated as follows:

"Petitioner was a very reputable physician whose specialty was internal medicine with particular reference to diseases of the heart. About two years before the occurrences which brought about these proceedings, he wrote two narcotic prescriptions for a woman who either was at that time or who later became, an informer for the Division of Narcotic Enforcement. As this informer did not testify at the trial, and as the doctor testified to the legitimacy of these transactions, and as they are not the subject of any charges against him, they are presumed to be legitimate and they simply give an introduction to the facts of the case.

"On April 19, 1948, this informer 'phoned to Doctor Davis and, according to the doctor's testimony, said that she had a friend who was suffering from cancer. The doctor endeavored to have her bring him to someone else, but she said that he was a stranger in town. She arrived in the doctor's office with Inspector Fennell, who passed as a 'Mr. Wilson,' and she asked, 'Is there anything you can do to help us?' The doctor replied, 'I haven't any now,' and said, either 'You know we can't write for you people' or 'We can't write prescriptions for you,' or words to that effect. He asked Fennell, 'Do you use it, too?' to which Fennell replied that he did. This question and answer, which are quite important, Fennell testified to on direct examination, and on cross-examination, saying that he remembered it distinctly. He told the woman, whom he called Bonnie, or Mrs. Barney, to call him up later and he would let her know.

"That the transaction was of suspicious nature from the

start appears from the facts that (a) the doctor made no inquiry of Fennell's pathology; (b) he announced from the start that he could not write a prescription (he understood that morphine was desired) though if there were a pathology requiring narcotics, there was no reason why he should not write a prescription; (c) the woman asked if the doctor couldn't help 'us' out; (d) if Fennell were really ill, there was no reason for deferring treatment and asking that the woman call up later. However, the doctor committed no offense at that time, for no narcotics were furnished.

"On April 27, the informer and the inspector visited the doctor the second time. The doctor required the woman to come into his office first, and since the informer did not appear at the trial, the only testimony we have is that of the doctor as to what occurred in his office then. In a short time, according to Fennell perhaps thirty or forty-five seconds, or perhaps a minute and a half, he invited Fennell in. At this point, the informer said 'He will let us have three half grains (or perhaps 'three halves') for $20.' The doctor handed over three tablets of morphine in a tissue, and the $20 was either left on the table or taken by the doctor, but in any event, paid.

"The illegitimacy of this transaction is apparent. No medical history of Fennell was taken, no inquiry was made as to previous medication, no examination whatever was made except looking at Fennell (Fennell denies that his glasses were removed, though the doctor asserts they were) and the alleged diagnosis was a combination of arthritis, tic and possibly gastric ulcers, summed up as pain, although at the trial, at least, the doctor remembered that the informer had said he had cancer. The woman related the quantity, three half grains, to a stated sum of $20, and she said he will let 'us' have the (morphine), though it was admitted the woman was not a patient. The 'fee' was $20 for a few minutes' visit. And, although the furnishing of narcotics by giving part of the office supply was not in itself an illegal method, combined with the other factors, it is plain why no prescription was issued. No record of the amount appears in the doctor's log book, though that fact may not be very important.

"Thereafter, the visits of Fennell alone on May 4, May 14 and May 21 were, in the main, repetitious of the first visit, with the added factors that the doctor required $50 thereafter, required payment in smaller bills than the $50 offered, inquired as to whether the money was marked, asked if anyone

had followed Fennell, told Fennell not to have his name or address on his person, kept no records of the $50 payments, dropped the $50 on May 21 into a sterilizer when the officers came, was told by Fennell that the latter made his money by 'hustling' a girl and had been arrested for vagrancy but never for 'junk,' never did any of the common examinations, such as blood pressure, and never prescribed any treatment, and upon his apprehension he claimed not to remember nearly everything that had happened. . . .

"The last question is: Did Fennell represent himself to be a narcotic addict, as set forth in Section 11164? He did not do so expressly. He did not say 'I am an addict,' or 'I am an habitual user'; but in answer 'Do you use it too?' he said that he did. This was, I think, sufficient to brand him as an addict unless and until the doctor should, by a reasonable examination, become reasonably satisfied that Fennell's use of morphine was a legitimate use. The 'representation' likewise was by conduct, which was sufficient to cause the doctor to be fearful of marked money, fearful that someone had followed Fennell, and unwilling to write a prescription."

### Sufficiency of the Evidence

■■■■ The board found that petitioner had violated sections 11163, 11164 and 11500 of the Health and Safety Code, thereby constituting unprofessional conduct within the meaning of section 2391.5 of the Business and Professions Code, which provides that the violation of any of the statutes of this state regulating narcotics constitutes unprofessional conduct. Section 11163, Health and Safety Code, provides: "Except in the regular practice of his profession, no person shall prescribe, administer, or furnish, a narcotic to or for any person who is not under his treatment for a pathology or condition other than narcotic addiction, except as provided in this division." Section 11164 provides: "No person shall prescribe for or administer, or dispense a narcotic to an addict, or to any person representing himself as such, except as permitted by this division." Section 11500 provides: "Except as otherwise provided in this division, no person shall possess, transport, sell, furnish, administer or give away, or offer to transport, sell, furnish, administer, or give away, or attempt to transport a narcotic except upon the written prescription of a physician, dentist, chiropodist, or veterinarian licensed to practice in this State."

Petitioner admits the furnishing of the narcotics to Fennell but contends that the evidence shows that they were

furnished as stated in section 11163, "in the regular practice of his profession"; that Fennell was not a person referred to in section 11164 as "an addict, or . . . person representing himself as such" or at least that the evidence does not establish that the narcotics were not furnished as allowed by these sections. He also contends that the narcotics were furnished as allowed by section 11330, Health and Safety Code, which provides: "A physician may prescribe for, furnish to, or administer narcotics to his patient when the patient is suffering from a disease, ailment, injury, or infirmities attendant upon old age, other than narcotic addiction. The physician shall prescribe, furnish or administer narcotics only when in good faith he believes the disease, ailment, injury, or infirmity, requires such treatment. The physician shall prescribe, furnish, or administer narcotics only in such quantity and for such length of time as are reasonably necessary."

Admittedly Fennel was not an addict. The board so found. It found, however, that he represented himself to be an addict or habitual user of narcotics. Petitioner challenges this finding and points out that Fennell at no time said he was an addict. However, as set forth in the extract from Judge Devine's opinion hereinbefore set forth, the evidence reasonably supports the conclusion that by his conduct he represented himself to be an addict and that petitioner thought he was, in spite of petitioner's testimony that he knew that Fennell was not an addict.

Petitioner testified that the informer, Mrs. Barney, told him on the phone that her friend was a very sick man, that he had cancer and was in great pain; that when Fennell walked into his office he had a marked forward and flexed position, a forward tilt with one arm lower than the other with a painful expression on his face, one side of it tilted up as though he had a facial paralysis, a marked twitching of the oral region and of the eyebrows, an abnormal movement of the eyeballs, and "this marked painful expression in the face, such as from a gaseous eruption." As a medical man he diagnosed the condition as spondylitis plus a neurological disorder or nervous involvement, and that Fennell was in great pain. Thus, says petitioner, the record establishes as a matter of law that he acted in good faith and according to fair medical standards. He then contends that whether he so acted must be determined solely by the testimony of medical experts, citing *Engelking* v. *Carlson*, 13 Cal.

2d 216 [88 P.2d 695]. However, there, in a malpractice case, the court was considering the tests of whether the doctor had the degree of skill and learning ordinarily possessed by physicians of good standing practicing in the same locality, and stated that whether the doctor had used ordinary care and diligence in applying that learning and skill was a question for medical experts, and that where the matter is one within the knowledge of experts only and is not within the common knowledge of laymen, the expert knowledge is conclusive. In our case the fact of the lack of any real examination of the alleged patient, the short time involved in the interviews, the answer by Fennell to the doctor's question if he used narcotics, the fees charged, the petitioner's question as to whether the currency was marked, his requirement that he be paid in smaller bills, his hiding the last payment in the sterilizer, the lack of instructions to the patient as to treatment, care of himself, or use of the pills, the lack of making a record of Fennell's visits, the petitioner's lack of inquiry as to examination or treatment of Fennel by other medical men, coupled with the petitioner's ready acceptance of Fennell's alleged statement that morphine was the only medicine that would give him relief, the temporary character of the remedy without any attempted consideration of permanent remedy or care,—all are within the common knowledge of laymen that doctors do not diagnose or treat illness that way nor do they, nor are they legally permitted to, furnish narcotics that way. In *Moran* v. *Board of Medical Examiners*, 32 Cal. 2d 301 [196 P.2d 20], the trial court found that the weight of the evidence did not support the board's finding that the doctor's treatment of the patient was not legally and medically proper. The facts are so dissimilar to those in our case that the case is not in point here. For one thing, there the doctor obtained from the patient and other doctors a long history of illness, complicated by the presence of an incurable disease. The court pointed out that the evidence was conflicting, and that as the trial court had resolved the conflict, the reviewing court's only province is to determine whether the evidence, viewed in the light most favorable to the trial court's findings, sustains those findings. Here, petitioner's evasiveness in his testimony and his own version of the circumstances of the various visits of Fennell are completely incompatible with action in good faith. The following language from *People* v. *Kinsley*, 118 Cal.App. 593, 601 [5 P. 2d 938], is applicable here: ''It is obvious that it was not

necessary to prescribe morphine to her, and that a cursory examination was given only for the purpose of furnishing an excuse or in pretended compliance with the law. At the time the other sales were made no examination was given to determine the necessity of prescribing morphine. . . . he also testified that he did not direct her as to the quantity she should take.''

As to section 11163 the evidence shows that petitioner furnished narcotics to Fennell and that it was done not in the regular practice of his profession. As to section 11164 the evidence shows that petitioner dispensed narcotics to a person representing himself as an addict. Petitioner gives the word ''dispense'' too narrow a definition, contending that it has reference only to the filling of prescriptions. Webster's New International Dictionary, 1931 edition, gives among other definitions of the word ''to distribute; to give''; it refers to the pharmaceutical definition, ''to put up (a prescription or medicine)'' as obsolete. Dorland's American Illustrated Medical Dictionary (1929 ed.) defines ''dispense'' ''To prepare and distribute medicines to those who are to use them.'' It is obvious that in section 11164, which was intended to prevent addicts from obtaining narcotics, the word ''dispense'' was never intended to have the narrow meaning given in Dorland above, and which Webster says is an obsolete meaning, but was intended to prohibit the giving or distributing of it. And as to section 11500 the evidence shows that petitioner sold and furnished to Fennell narcotics without a written prescription.

It is not clear from petitioner's briefs whether he contends the fact of the dismissal of the complaint in the criminal action after jury disagreement prevents the acceptance of the evidence therein as being sufficient to support charges of violation of the above-mentioned sections of the Health and Safety and the Business and Professions Codes. If so, the contention is erroneous. (*Stuck* v. *Board of Medical Examiners,* 94 Cal.App.2d 751 [211 P.2d 389].)

### The Penalty

Petitioner contends that the revocation of his license is a penalty so disproportionate to the violations involved as to amount to an abuse of discretion by the board, and necessarily that the trial court erred in not revising the penalty. Assuming that this court has the power in a proper case to

reverse a judgment of this type for reconsideration of the penalty, we do not deem that this is such a case. True, the board found by way of mitigation that he is a married man, father of two children, had an excellent war record, had established an extensive and busy practice in the special field of internal medicine, specifically heart conditions, in which the use of narcotics is an essential element; that he had expended a substantial portion of his time in charitable work for a number of San Francisco hospitals and clinics; that he has a good reputation in his community as a law-abiding citizen, a conscientious and ethical physician, and for truth, morality, honesty and integrity among members of his own profession and others, and that he attempted to discourage the repetition of visits by Fennell. We cannot say, however, that such a man is entitled to any more leniency when he violates the law and his duty as a physician for the sole motive shown by the evidence, money, than the physician who does not stand so high in his profession, does not have such a large practice, and who, perhaps, needs the money more than petitioner did. In fact, the temptation for petitioner should have been easier to resist. In *Cooper* v. *State Board of Public Health*, 102 Cal.App.2d 926 [229 P.2d 27], where the same contention of excessive penalty was made as here, the court stated (p. 932): "The question on appeal is whether the evidence, viewed in the light most favorable to the board, sustains the finding of the trial court to the effect that the penalty of revocation is not so disproportionate to the offenses found to have been committed by the petitioner as to amount to an abuse of discretion on the part of the board." Its characterization of the situation applies to the one here (p. 932): "The record shows, largely on petitioner's own testimony, that . . . he deliberately and consciously violated the statutes we have referred to, for personal, financial aggrandizement— without excuse, mitigation or palliation. Manifestly, the findings of the trial court are supported by the evidence."

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied January 26, 1952, and appellant's petition for a hearing by the Supreme Court was denied February 21, 1952.