[Crim. No. 5748.   In Bank.   May 8, 1956.]

THE PEOPLE, Respondent, v. LESLIE ROBERT. NUNN, Appellant.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

McCOMB, J.—After trial before a jury defendant, an osteopathic physician, was convicted on four counts of prescribing narcotics for a person not under his treatment for a pathology, in violation of section 11163 of the Health and Safety Code.[1]

He was also convicted of one count of prescribing a narcotic for a person "who represented himself to be an addict," in violation of section 11164 of the same code.[2]

He appeals from the judgment and order denying his motion for a new trial.

About 3 p. m. on February 3, 1954, pursuant to instructions from his superior officer, who directed him to use the name "Joe Dillon," State Narcotics Inspector Clarence A. Shaw went to the office of defendant, who was an osteopathic physician and surgeon licensed to practice in the State of California. Inspector Shaw entered the waiting room. Shortly thereafter defendant came from his private office, whereupon Inspector Shaw said "I am Dillon," and defendant asked, "Are you the one Walter sent?" The inspector said he was.

The inspector and defendant went into the doctor's private office where defendant asked the inspector his first name, to which he replied that it was "Joe." Defendant asked him his address and was told that it was "2903 Rodeo Road, Los Angeles." The doctor entered this information on his patient's history card, together with the inspector's age, sex and race. Defendant then handed the card, which had no writing on it other than that heretofore mentioned, to the inspector, requesting him to sign it on the line where he had placed an "x." Defendant asked the inspector what he was using, to which he replied, "I am using H," which in the vernacular means heroin. Defendant said "I cannot write a

---

[1] Section 11163 of the Health and Safety Code reads: "Except in the regular practice of his profession, no person shall prescribe, administer, or furnish, a narcotic to or for any person who is not under his treatment for a pathology or condition other than narcotic addiction, except as provided in this division."

[2] Section 11164 of the Health and Safety Code reads: "No person shall prescribe for or administer, or dispense a narcotic to an addict, or to any person representing himself as such, except as permitted by this division."

prescription for heroin, but I can write for some legitimate drug like morphine or dilaudid.'' The inspector said that would be all right.

Defendant then wrote and signed a narcotics prescription calling for 60 tablets of 1/16 grain dilaudid to be taken one or two every four hours as needed. Defendant handed the prescription to the inspector and charged him $20.

On the patient's history card which was received in evidence there had been filled in ''1. Migraine Headache'' and ''2. Narcotic Addiction'' below the space provided for ''Diagnosis.''

On February 11, 1954, at about 2 p. m., Inspector Shaw went to defendant's home at 99 Las Flores Canyon Road, Malibu. Defendant was fixing the mail box on his property by the main road. Inspector Shaw said to defendant ''Hello,'' and defendant asked him if he had a pen. The inspector replied that he did not, and defendant said, ''My prescription books are in the car, but I will have to get my pen.''

They both went in separate cars to the house, which was a short distance from the mail box. At the house defendant wrote and signed a prescription in a prescription book. Defendant asked for the inspector's address again, and the inspector said it was 2903 Rodeo Road. Defendant asked him if 80 tablets would hold him for a week, to which the inspector replied that they would. The inspector told defendant that he liked that very much, and asked him if he could come there again the next week. Defendant replied that it would be all right.

Defendant gave the prescription, which called for 80 1/16 grain tablets of dilaudid, to the inspector, who paid $50 for it.

On February 18, 1954, at about noon, Mr. Shaw drove to defendant's home in Malibu. Defendant answered the inspector's knock at the door and they both walked out to the car, where defendant asked Mr. Shaw if 85 tablets would hold him. The inspector said that it would and that he would be out of town the next week so he wanted to go to defendant's office on the 24th of February. Defendant said that would be all right.

Defendant then wrote and signed a prescription for 85 tablets of 1/16 grain dilaudid and gave it to the inspector, who paid him $40 for it.

On February 24, 1954, Mr. Shaw went to defendant's office in West Los Angeles about noon. There the doctor started to write a prescription and asked him if his address was 2903 Rodeo Road. The inspector said that it was, and the defend-

ant said that as soon as they got the physical examination out of the way he could write a prescription for more than 100 tablets. This was the only time in the various interviews that there was any mention of the inspector's physical condition.

He was then given the prescription, which called for 85 1/16 grain dilaudid tablets, and he paid defendant $40 for it.

Defendant never made any physical examination of Inspector Shaw nor did the inspector ever tell defendant that he had any physical ailment other than that he was using heroin. He never at any time told defendant that he suffered from migraine headaches or any physical ailment, nor was he during this period confined in any medical institution of the state, county or city, and he was not under treatment in any institution for any ailment or for narcotic addiction. He in fact did not use narcotics.

Defendant relies for reversal of the judgment upon these grounds:

■ *First*: *That the evidence was insufficient to support the verdicts.*

This contention is devoid of merit. From the facts set forth above, the jury was fully justified in believing that defendant had on four different occasions violated section 11163 of the Health and Safety Code by prescribing a narcotic to or for a person not under treatment for a pathology or condition other than narcotic addiction. (*Cf. People* v. *Whitlow,* 113 Cal.App.2d 804, 807 [6] [249 P.2d 35]; *Davis* v. *State Board of Medical Examiners,* 108 Cal.App.2d 346, 352 [239 P.2d 78].) Also that defendant had violated the provisions of section 11164 of the Health and Safety Code in that he had prescribed a narcotic for a person representing himself as a narcotic user. (*Cf. Davis* v. *State Board of Medical Examiners,* 108 Cal.App.2d 346, 350 et seq. [239 P.2d 78].)

Defendant asked Inspector Shaw "What are you using?" and the inspector said "I am using H," which in the vernacular means heroin. Defendant clearly understood that it meant heroin, which is a contraband drug, because he answered "I cannot write a prescription for heroin but I can write for some legitimate drug like morphine or dilaudid." He then wrote a prescription for dilaudid and gave it to the inspector. The conclusion is inescapable that Inspector Shaw represented himself to be an addict, that defendant believed he was an addict and prescribed a narcotic for him in a manner not permitted by law.

■ *Second: That the court committed prejudicial error in the admission of evidence.*

Defendant contends that Inspector Blanchard was improperly permitted to give his opinion that most narcotic addicts are caused by criminal association and not by the medical profession, because it was rebuttal of a collateral matter brought out on cross-examination by the prosecution and was immaterial to the issues of the trial.

This contention is untenable. Defendant on direct examination testified that he believed on February 3, 11, 18 and 24, 1954, that "Dillon" was suffering from a migraine headache for which he had previously taken heroin and might be an addict, and that he prescribed the narcotic in the belief that he was properly treating Dillon for a pathology by relieving his pain.

The People were justified in believing it would be contended defendant was acting reasonably and in the ordinary practice of his profession in prescribing the narcotic in the amounts that he did, since he had no reason to know or believe that such pathology did not exist but had reason to believe that it did.

It was therefore appropriate to ask defendant concerning the reasonableness of his conduct and to bring out in connection with such reasonableness that defendant believed it was quite possible that a person using narcotics for the relief of a pain would become addicted to the narcotic. Also that he believed the majority of narcotic addicts were produced that way. The deduction could then be made by the jury that most narcotic addicts suffered from pain for which they had first taken the narcotics to which they became addicted, and that it was more likely a person who was addicted would suffer from a painful pathology. This would support defendant's position that he believed that "Dillon" was suffering from a painful pathology.

This deduction could reasonably be controverted by showing that it was not true that most addicts are created by the medical profession through the use of narcotics to relieve pain.

To forestall such a deduction and not to impeach defendant, the People properly presented the opinion of Inspector Blanchard on the subject.

The evidence disclosed that Inspector Blanchard had a knowledge of the causes of narcotic addiction, gained through experience in interviewing addicts and study, not possessed by the average man. He thus qualified as an expert and

as such his opinion was properly received. (*People* v. *Ernst,* 121 Cal.App.2d 287 at 292 [263 P.2d 114] ; *People* v. *Horowitz,* 70 Cal.App.2d 675, 689 [13] [161 P.2d 833].)

*Third: That section 11163 of the Health and Safety Code is unconstitutional because the term "except in the regular practice of his profession" is too vague, indefinite and uncertain to give notice of what constitutes the act sought to be prohibited.*

This proposition is devoid of merit. ■ To comply with the constitutional requirement of due process of law, the crime for which defendant is being prosecuted must be clearly defined, but it is only necessary that the words used in the statute be well enough known to enable those persons within its purview to understand and correctly apply them. (*Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [7] [216 P.2d 859].)

■ Section 2137 of the Business and Professions Code provides: "The physician's and surgeon's certificate authorizes the holder to use drugs or what are known as medical preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions."

Sections 11161 to 11571 of the Health and Safety Code give physicians and surgeons certain rights with regard to narcotics and prohibit certain acts with regard to them.

Business and Professions Code, sections 2360 through 2411 provide for revocation of the certificate of a physician and surgeon for "unprofessional conduct" and specify numerous acts which constitute unprofessional conduct. The "regular practice of his profession" covers the activity allowed by Business and Professions Code, section 2137, and those parts of the Health and Safety Code which give the physician and surgeon certain rights with regard to narcotics, as long as that activity is untainted by any of the acts which specifically constitute unprofessional conduct or acts which are prohibited by the Health and Safety Code. Thus, the "regular practice of his profession" is a term clearly to be understood from the statutes, and it is well enough known to enable a person practicing as a physician and surgeon to understand and apply it. Therefore, section 11163 of the Health and Safety Code is constitutional.

■ Defendant further contends that section 11330 of the Health and Safety Code is unconstitutional because the term "good faith" is too vague, indefinite and uncertain

to form the basis of a criminal prosecution. This section reads:

"A physician may prescribe for, furnish to, or administer narcotics to his patient when the patient is suffering from a disease, ailment, injury, or infirmities attendant upon old age, other than narcotic addiction.

"The physician shall prescribe, furnish, or administer narcotics only when in good faith he believes the disease, ailment, injury, or infirmity, requires such treatment.

"The physician shall prescribe, furnish, or administer narcotics only in such quantity and for such length of time as are reasonably necessary."

A similar contention was made before the Supreme Court of Illinois in *People* v. *Guagliata,* 362 Ill. 427 [200 N.E. 169, 103 A.L.R. 1035]. In disposing of the contention and holding that the words "good faith" have a common and generally accepted meaning, the court at page 171 [200 N.E.] said: "The words complained against have been defined in many cases in many jurisdictions. In *Crouch* v. *First Nat. Bank,* 156 Ill. 342 [40 N.E. 974, 979], we said that 'good faith' means 'honest, lawful intent,' and in *McConnel* v. *Street,* 17 Ill. 253, we said that 'good faith' is the 'opposite of fraud and bad faith.' Numerous cases in other jurisdictions give substantially similar definitions. A liberal construction should be given constitutional provisions in order to sustain legislative enactments, and all doubts and uncertainties arising from the Constitution, as well as the statute, should be resolved in favor of the validity of the statute. (Citing cases.) The words 'good faith,' as used in paragraph 3, have a definite and well-understood meaning, are free from ambiguity, and their use in the act does not violate the due process clause of the State or Federal Constitution. (Citing cases.)"

The phrase "good faith" in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation. (See 18 Words and Phrases (perm. ed. 1940), p. 475 et seq.; 35 C.J.S. (1943), p. 488; Bouvier's Law Dict. (Rawle's 3d rev. 1914), p. 1359.)

We therefore hold that the words "good faith" as used in Health and Safety Code, section 11330, have a definite and well-understood meaning, are free from ambiguity, and their use in the statutes does not violate the due process clause of the federal Constitution.

Defendant further contends that the statutes of the Health and Safety Code are unconstitutionally applied in that the inspectors from the State Bureau of Narcotics Enforcement, rather than defendant, were allowed to determine whether or not defendant acted "in the regular practice of his profession" and in "good faith." This is not the case. The narcotic inspectors testified to certain facts; defendant testified to others. The determination of whether defendant acted "in the regular practice of his profession" and in "good faith" was left to the jury, which believed the facts were as testified to by the inspector, and that such facts did show that defendant had not acted "in the regular practice of his profession" and in "good faith."

*Fourth: That Health and Safety Code, section 11164, is unconstitutional because (1) the Legislature cannot deprive a doctor of the right to prescribe for any patient, including one who may be an addict, and (2) the section leaves the subject of who constitutes an addict to speculation and conjecture.*

This proposition is untenable. (1) The Legislature has the power to regulate the practice of a profession which affects the public health and safety. (*Cf. Hewitt* v. *State Board of Medical Examiners,* 148 Cal. 590 at 592 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A.N.S. 896]; *People* v. *Ratledge,* 172 Cal. 401 at 405 [156 P. 455].)

(2) Addict is defined in section 11009 of the Health and Safety Code as follows: "'Addict,' as used in this division, means a person who unlawfully uses, or is addicted to the unlawful use of, narcotics." Therefore, the question of who constitutes an addict is not left to speculation and conjecture, but is clearly and definitely defined by law.

*Fifth: That defendant was unlawfully entrapped.* This contention is likewise without merit. The trial judge fully and completely instructed the jury upon the law relative to entrapment.

Defendant claims that the narcotics inspector's acts in giving a false name and address and telling him he was using "H" were illegal and that a conviction resulting from the use of evidence secured by such acts is against public policy, void, and a denial of the due process of law.

Health and Safety Code, sections 11170 and 11170.5, forbid any person to "obtain or attempt to obtain narcotics (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by the concealment of a material fact," or to give a false

name or address in connection with the prescribing of a narcotic.

Health and Safety Code, section 11710, provides: "All duly authorized peace officers, while investigating violations of this division in performance of their official duties, and any person working under their immediate direction, supervision or instruction, are immune from prosecution under this division."

Health and Safety Code, sections 11170, 11170.5 and 11710, are all in division 10 of such code, as are sections 11163 and 11164, a violation of which sections defendant was found guilty.

Duly authorized peace officers, while investigating violations of Health and Safety Code, sections 11163 and 11164, are immune from prosecution for violating such sections. Since Shaw was (a) a narcotics inspector for the State of California, and (b) was acting pursuant to the orders of his chief, Walter Creighton, who told him to go to defendant's office and use the name "Joe Dillon" to see if defendant would write a prescription for narcotics for him, the inspector was clearly engaged in enforcing the laws regulating the prescribing of narcotics by investigating to see whether or not defendant had an existing intention of ignoring the laws forbidding his prescribing narcotics except under certain specified circumstances, and was performing his official duties.

He was immune from prosecution while investigating violations of the provisions of sections 11170 and 11170.5 of the Health and Safety Code. Thus, contrary to defendant's contention, he was not violating any law and his acts were not illegal when he gave a false name and address in attempting to buy narcotics from defendant. (See *United States* v. *Swift*, 186 F. 1002 at 1017.)  Because the inspector was immune from prosecution for the acts which he performed, there is no merit in defendant's contention that he was an accomplice to the issuance of the prescriptions in violation of Health and Safety Code, sections 11163 and 11164, as an accomplice must be liable to prosecution for the identical offense charged against the defendant. (Pen. Code, § 1111.) Here the inspector was immune from such prosecution.

Defendant urges certain language used in *People* v. *Cahan*, 44 Cal.2d 434 at 472 [282 P.2d 905], in support of his contention that the People should not be permitted to use the evidence obtained by the narcotics inspector because he procured it by false representations. The language used in the Cahan case had reference to the facts in such case and

has no application to such facts as the record discloses in the instant proceeding.

█ This court has held that where an accused has a preexisting criminal intent, the fact that when solicited by a decoy he commits a crime, raises no inference of unlawful entrapment. (*People* v. *Braddock*, 41 Cal.2d 794 at 802 [10] [264 P.2d 521].) █ Also that entrapment as a matter of law is not established where there is any substantial evidence from which it may be inferred that criminal intent to commit a particular offense originated in the mind of the accused. (*People* v. *Terry*, 44 Cal.2d 371 at 372 [2] [282 P.2d 19].)

█ In the instant case it is clear the jury was justified in finding from the evidence that the criminal intent originated in the mind of defendant and therefore the mere fact that he was solicited by a decoy to commit the crime raises no inference of an unlawful entrapment.

█ *Sixth: That the trial court erred in refusing to give certain instructions requested by defendant.*

This contention is devoid of merit. An examination of the record shows that the trial judge fully, fairly and clearly advised the jury on each and every material issue and that the instructions requested by defendant and refused were either covered by instructions read by the judge to the jury or were not applicable to the facts in the instant case.

The judgment and order denying a new trial are each affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

I cannot agree that any law of the State of California permits an officer to go about using a fictitious name and make false statements to induce a doctor to prescribe a narcotic or medicine that requires a prescription for a patient, and to misrepresent that he is such patient. Such conduct, whether by an officer, or anyone else, violates sections 11170, 11170.5 and 11171 of the Health and Safety Code.

Section 11170 of the Health and Safety Code provides as follows: "(1) No person shall obtain or attempt to obtain narcotics, or procure or attempt to procure the administration of or prescription for narcotics, (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by the concealment of a material fact. . . . (3) No person shall, for the purpose of

obtaining narcotics, falsely assume the title of, or represent himself to be [here follows a list of authorized persons] *or other authorized person. . . ."* (Emphasis added.)

Section 11170.5 of the Health and Safety Code says: "No person shall, in connection with the prescribing, furnishing, administering, or dispensing of a narcotic, give a false name or false address."

Section 11171 reads: *"No person* shall obtain or possess a prescription that does not comply with this division." (Emphasis added.)

It is plain from the foregoing that the officer violated every one of these mandates of the Legislature. He obtained each of the prescriptions involved in this case (a) by fraud, deceit, misrepresentation, and subterfuge; and (b) he concealed a material fact, namely his true identity.

He represented himself to be an authorized person, which he was not.

He obtained and possessed prescriptions that did not comply with the provisions of the Health and Safety Code. Thereafter he falsely had them filled in violation of section 11170 of the Health and Safety Code.

The Legislature clearly intended these sections to apply to *all persons.*

False and fictitious use of one's name and misrepresentation of one's character are fraud and deceit, which the statute expressly forbids. Fraud vitiates everything. It nullifies judgments obtained thereby.

If these statutes that expressly forbid *any person* to use these means, are changed by judicial construction, to authorize an officer to obtain a prescription (a) by fraud, deceit, misrepresentation, or subterfuge; or (b) by concealment of a material fact, or by giving a false name or address, or obtain or possess a narcotic that does not comply with these provisions of the Health and Safety Code, then such sections, if thus construed and applied, violate due process of law guaranteed by the Fourteenth Amendment to the Constitution of the United States. That constitutional guarantee provides for American standards for the administration of justice and conduct consistent with the fundamental principles of liberty and justice must lie at the base of all our civil and political institutions. (*Hebert* v. *Louisiana,* 272 U.S. 312, 316 [47 S.Ct. 103, 71 L.Ed. 270, 48 A.L.R. 1102]; *Twining* v. *New Jersey,* 211 U.S. 78, 100 [29 S.Ct. 14, 53 L.Ed. 97]; *Palko* v. *Connecticut,* 302 U.S. 319, 323, 325, 326 [58 S.Ct. 149, 82 L.Ed. 288]; *Francis* v. *Resweber,* 329 U.S.

459, 463 [67 S.Ct. 374, 91 L.Ed. 422] ; *Adamson* v. *California,* 332 U.S. 46, 53 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].)

The obtaining of a prescription from a duly licensed doctor by means of fraud, deceit and misrepresentation—in violation of the express commands of the Legislature—is reprehensible, unlawful, and contrary to the conscience of mankind. This court is not authorized to legislate that it is lawful or to condone it judicially. If it does, then the statutes, as thus construed, violate the Fourteenth Amendment to the Constitution of the United States.

If the knowing presentation of perjured testimony in a criminal prosecution amounts to the denial of due process of law (*Mooney* v. *Holohan,* 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]), it should follow as a matter of course that evidence obtained by means of fraud, deceit and misrepresentation should have the same effect.

The purity of the courts belongs to the courts. (*Sorrells* v. *United States,* 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249] ; *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905] and cases cited therein.)

When the officer in this case falsified his name and character he acted in an individual capacity, for the state did not authorize him to act falsely and fraudulently and to violate the express provisions of the Health and Safety Code. But if we approve such conduct then we become a party to it. This the court cannot do, lest the citizen shall say, ''If the officer can falsify, why can't we?'' Courts of justice must set an example of truth and justice and equal application of the law's mandates to officers and citizens alike, lest the bad example of one shall lead to misconduct of the other. Civilized standards of due process guaranteed by the federal Constitution forbid this.

I do not think this court or any court should ratify, adopt and approve such lawless disregard of honesty, decency and the express and plain provisions of the Health and Safety Code as written and adopted by our lawmakers.

For the foregoing reasons and those stated in my dissenting opinion in *People* v. *Braddock,* 41 Cal.2d 794, 803 [264 P.2d 521], I would reverse the judgment and grant defendant a new trial.

Appellant's petition for a rehearing was denied June 6, 1956. Carter, J., was of the opinion that the petition should be granted.