ROBERT C. HULSE, Appellant, v. SHERIFF, CLARK COUNTY, NEVADA, Respondent.

No. 6742

June 29, 1972                                   498 P.2d 1317

*Wiener, Goldwater, Galatz & Raggio, Ltd.,* of Las Vegas, for Appellant.

*Robert List,* Attorney General, *Roy A. Woofter,* District Attorney, *Charles L. Garner,* Chief Deputy District Attorney, Clark County, for Respondent.

## OPINION

By the Court, BATJER, J.:

The appellant is a licensed physician practicing medicine in Las Vegas. He was charged by criminal complaint with unlawfully prescribing narcotic drugs in violation of NRS 453.030[1] and NRS 453.080(1).[2] After a preliminary examination the appellant was bound over to the district court for trial. He petitioned for a writ of habeas corpus, contending that there was not sufficient evidence presented to the magistrate to constitute probable cause to believe that a crime had been committed or that he had committed a crime. The district court denied the writ and dismissed the petition. This appeal followed.

The appellant practiced medicine in Las Vegas in association with two other physicians. On several occasions one Larry Chapman had been treated by one of the appellant's associates for a bowel disorder known as diverticulitis. That physician had prescribed an antibiotic and the drug "numorphan,"[3] a narcotic, to relieve the patient's pain. According to that doctor's records the patient was allergic to analgesics, but he had been able to take numorphan without a reaction.

---

[1]NRS 453.030: "It shall be unlawful for any person to manufacture, possess, have under his control, sell, prescribe, administer, dispense, or compound any narcotic drug, except as authorized in NRS 453.010 to 453.240, inclusive."

[2]NRS 453.080: "(1) A physician or a dentist, in good faith and in the course of his professional practice only, may prescribe, administer, and dispense narcotic drugs, or he may cause the same to be administered by a nurse or intern under his direction and supervision.

[3]Numorphan is the registered trade name for oxymorphone, also known as dihydrohydroxymorphinone, a derivative of dihydrohydroxycodeinone. The Merck Index, (Encyclopedia of Chemicals and Drugs) 775, 8th Ed. (1968); cf. State v. Livingston, 469 P.2d 632 (Ore.App. 1970).

In January of 1970, the appellant's associate was unable to see Chapman, and he was given an appointment with the appellant. The appellant reviewed the patient's medical record and took from him a history of abdominal pain which had been diagnosed as diverticulitis. The patient also related that he had been treated by other physicians for that condition before seeing the appellant's associate. A physical examination of the patient conducted by the appellant revealed that he had considerable pain in the lower left side of his abdomen. This fact, together with the patient's medical history, suggested to the appellant that Chapman was suffering from recurring diverticulitis. The appellant suggested a diet and prescribed a combination of antibiotics to combat any infection that might be causing intestinal inflammation, and numorphan to relieve pain.

The appellant saw Chapman at periodic office visits during the next several months. He testified that he continued to prescribe antibiotics and numorphan to enable the patient to function normally in his occupation. On one of the office visits, when the appellant suspected that a complication had developed in the nature of a diverticular abscess, he referred the patient to another physician who saw him on several occasions. That physician's examination of the patient essentially confirmed that Chapman suffered pain and had symptoms characteristic of diverticulitis. A berium enema was given by a radiologist and x-rays were taken, but the quality of the x-rays was such that the actual presence of diverticulitis could neither be confirmed nor excluded. The appellant arranged for Chapman to receive hospital treatment, but according to appellant's testimony the patient contended that his finances would not permit hospitalization.

Over the course of approximately seven months the appellant saw Chapman some twenty-four times. Some visits were at regularly scheduled appointments and some were unscheduled. A total of sixty-eight prescriptions were written for the patient, all for ten milligram numorphan tablets. The appellant's office records were somewhat sketchy. Sometimes he would make an entry describing what occurred at an office visit, and sometimes he would not. Sometimes he would note what medication he prescribed for the patient, and sometimes he would not. On several of the patient's visits the appellant wrote out more than one prescription for the drug numorphan, and some of the prescriptions were undated. In all, the appellant prescribed numorphan for the patient at the rate of approximately 50 tablets per day over the seven month period.

The appellant testified that he wrote multiple prescriptions,

and that he wrote undated prescriptions because occasionally he planned to be out of town and away from his office, and he did not want the patient to run out of the medication. His testimony was to the effect that he was genuinely concerned about the amount of pain the patient was suffering and the persistence of that pain.

Eventually the appellant became concerned about the amount of numorphan Chapman seemed to require, and he testified that they discussed its narcotic characteristics. He claimed to have encouraged the patient to try to control his use of numorphan, and that he believed the patient was tapering off in his use of the drug. Later, however, when the patient's tolerance seemed to be increasing, the appellant became concerned about possible addiction. He further testified that he had no prior experience with any addict so he made inquiry of the Las Vegas police department to see if Chapman had any record of drug addiction. He was informed that there was no record.

In August of 1970 an investigator from the Clark County District Attorney's office informed the appellant that Chapman was being investigated for forged prescriptions, and that several physicians were under investigation also. The appellant asked the investigator what he should do if he saw Chapman again. He was told to telephone the investigator. The appellant did have occasion to see Chapman again, at the hospital parking lot, and they discussed the forged prescriptions. The appellant told the patient that unless he consented to being hospitalized he could not prescribe any more medication for his pain. The patient continued to deny financial means to become hospitalized, complained of continuing pain and requested another prescription. The appellant gave the patient a final prescription, then called the investigator and related what had happened at this confrontation with Chapman.

Throughout the entire period of some seven months the appellant charged the patient only for the office visits, and then only the routine fee. No charge was made for the unscheduled visits or for the times the appellant saw the patient without making a notation on his chart. No charge was ever made for the prescriptions. The investigator who testified at the preliminary examination admitted that there was no evidence that the appellant received anything by way of profit from the prescriptions given to Chapman, and the state acknowledged that the investigation of the appellant failed to disclose any evidence that he had prescribed the narcotic numorphan for any other individual.

On the record before us it appears that the relationship

between appellant and Chapman was a genuine physician-patient relationship. Furthermore, it appears that the appellant's prescription of the drug numorphan was in good faith. There is nothing in the record to suggest that the appellant was concerned with anything except the treatment of a genuine physical ailment and the relief of the pain that such ailment was causing to the patient. Even the final prescription was given to relieve Chapman's professed pain and in the hope that it would lead to his hospitalization. Moreover, the appellant reported what he had done to the district attorney's office in accordance with instructions.

In order for a magistrate to bind a defendant over to the district court for trial it must appear from the evidence at the preliminary examination that there is probable cause to believe that a criminal offense has been committed and that the defendant has committed it; otherwise the magistrate must discharge him. NRS 171.206; Kinsey v. Sheriff, 87 Nev. 361, 487 P.2d 340 (1971); State v. von Brincken, 86 Nev. 769, 476 P.2d 733 (1970). Here the evidence must show probable cause to believe that the appellant prescribed the narcotic drug either outside the scope of the physician-patient relationship, or that he did so without the good faith required by the statute. The proof presented to support the charges against the appellant fails to meet those criteria.

The law affords every physician a presumption that whenever he attends a patient the treatment he renders is given in good faith. Good faith means good intent and the honest exercise of the physician's best judgment as to the needs of his patient. Mere errors of judgment are not evidence of bad faith. Smith v. State, 13 N.E.2d 562 (Ind. 1938). The term "good faith" has been defined as an honest, lawful intent, and as the opposite of fraud and bad faith. People v. Nunn, 296 P.2d 813 (Cal. 1956).

In order to bind over a physician charged with unlawfully prescribing narcotics to the district court for trial, it is necessary for the state to present evidence tending to overcome the presumption that the physician prescribed the narcotics in good faith.

We have before us evidence of numerous prescriptions of an extremely large number of pills of narcotic nature, and we are certain that the magistrate as well as the district judge were deeply concerned about this fact, yet we find no evidence in this record to show that the prescribing of this volume of pills over

a period of some seven months amounts to bad faith. Two physicians appearing as witnesses for the state testified that numorphan administered intravenously or intramuscularly was ten times stronger than morphine. However, there is no evidence of the potency of morphine, nor evidence of what would constitute a bad faith prescription or prescriptions of morphine. Courts cannot take judicial notice of the potency of either morphine or numorphan or of what amount is excessive. Furthermore, there is no evidence of any prescription of numorphan to be administered intravenously. All of the numorphan prescribed for Chapman by the appellant was for oral consumption.

The appellant also testified that numorphan was considered to be ten times stronger than morphine.[4] When asked on cross-examination about the known tolerance of narcotics he stated that upon his personal knowledge addicts had on occasion been given and had tolerated as much as five grams of morphine intravenously, which would be comparable in potency to about five hundred 10-milligram numorphan tablets.

There appears to be only limited statutory controls on the kind or quantity of any narcotic drug that may be prescribed for the use of any individual. In NRS 453.090(3)(a) the legislature places a limit on the amount of paregoric and codeine that may be prescribed for the use of any one person within a 48-hour period, but modifies the effect of that section by NRS 453.-090(4) which reads: "Nothing in this section shall be construed to limit the kind and quantity of any narcotic drug that may be prescribed, administered, dispensed, or sold to any person or for the use of any person or animal when it is prescribed, administered, dispensed, or sold in compliance with the general provisions of NRS 453.010 to 453.240, inclusive."

Pursuant to NRS 453.100(1), physicians are allowed, within

[4]Dr. Robert C. Hulse being questioned on direct examination by his attorney:

"Q.  Doctor, we heard some testimony about comparative strengths of numorphan and morphine. Would you tell His Honor what the comparative strengths of these two drugs are in various forms of administration?

"A.  Numorphan can be prescribed in two forms, either by injection or orally. The injectable form of numorphan is approximately ten times as strong as the oral form. Which is to say, you give one milligram of numorphan by injection. The tablet size is ten milligrams. Numorphan is also, by injection, ten times more potent than morphine. This is an average figure. . . .

"Q.  One milligram of numorphan by injection versus one milligram of morphine by injection, what would be the strength?

"A.  The numorphan is considered to be ten times stronger than the morphine."

limited amounts and time periods, to administer narcotic drugs without making a record.[5] They are limited to dispensing, without record, to any one individual during any 48-hour period a one-half grain of morphine, and numorphan in an amount not to exceed in pharmacologic potency any of the drugs named in NRS 453.100(1) in the quantity stated. However, because the record does not reveal the relative pharmacologic potency of numorphan to the drugs listed in NRS 453.199(1), we cannot nor could the magistrate or the district court determine how much numorphan might be dispensed without record.[6] There are no other statutory provisions to assist or guide the courts in determining when narcotic prescriptions have been issued in bad faith.

Some evidence of an unlawful intent is required. The number of prescriptions or amount of pills prescribed or an infraction of the dating requirements in and of themselves do not show unlawful intent. Criminal intent is the essential element of proof. It is incumbent upon the state to prove it, and absent operative facts in support of a lack of good faith there is no

[5]NRS 453.100, in pertinent part reads as follows: "1. Every physician, dentist, veterinarian, or other person who is authorized to administer or professionally use narcotic drugs, shall keep a record of such drugs received by him, and a record of all such drugs administered, dispensed, or professionally used by him otherwise than by prescription. It shall, however, be deemed a sufficient compliance with this subsection if any such person using small quantities of solutions or other preparations of such drugs for local application shall keep a record of the quantity, character, and potency of such solution or other preparations purchased or made up by him, and of the dates when purchased or made up, without keeping a record of the amount of such solution or other preparation applied by him to individual patients.

"Provided: That no record need be kept of narcotic drugs administered, dispensed, or professionally used in the treatment of any one patient when the amount administered, dispensed, or professionally used for that purpose does not exceed in any 48 consecutive hours:

"(a). Four grains of opium; or

"(b). One-half of a grain of morphine or of any of its salts; or

"(c). Two grains of codeine or of any of its salts; or

"(d). One grain of extract of cannabis or 1 grain of any more potent derivative or preparation of cannabis; or

"(e). A quantity of any other narcotic drug or any combination of narcotic drugs that does not exceed in pharmacologic potency any one of the drugs named above in the quantity stated."

[6]The approximate U.S. equivalent of a milligram is 0.015 grains. (Webster's Third New International Dictionary, Unabridged, (1968).) Four 10-milligram tablets would contain slightly more than one-half of a grain (approximately 0.616 grains).

crime committed by a licensed physician prescribing narcotics to a patient.

The burden is not on the accused by way of an affirmative defense to prove either "good faith" or the absence of criminal intent in circumstances where the proof is deficient to show that a crime has been committed. Only when the evidence has established the commission of a crime, and that the accused probably committed it, may such a burden be imposed. NRS 453.190;[7] Wrenn v. Sheriff, 87 Nev. 85, 482 P.2d 289 (1971).

The magistrate erred in binding the appellant over for trial and the district court should have granted habeas corpus. We reverse the order dismissing the petition, and the district court is directed to issue the writ of habeas corpus discharging the appellant from restraint. This opinion shall not be construed as barring further prosecution by the office of district attorney. NRS 178.562(2).

ZENOFF, C. J., and THOMPSON and GUNDERSON, JJ., concur.

MOWBRAY, J., dissenting:

Respectfully, I dissent.

Robert C. Hulse was charged by criminal complaint with unlawfully prescribing narcotic drugs in violation of NRS 453.-030 and NRS 453.080, subsection 1. After a lengthy preliminary hearing before the magistrate, Doctor Hulse was held to answer the charge in the district court. There he filed a habeas petition challenging the sufficiency of the evidence adduced at the preliminary hearing. The district judge reviewed that evidence and found therefrom probable cause to believe that an offense had been committed and Doctor Hulse had committed it.[1] The district judge denied the habeas petition; hence, this

---

[7] NRS 453.190: "In any complaint, information, or indictment, and in any action or proceeding brought for the enforcement of any provision of NRS 453.010 to 453.240, inclusive, it shall not be necessary to negative any exception, excuse, proviso, or exemption contained in NRS 453.010 to 453.240, inclusive, and the burden of proof of any such exception, excuse, proviso, or exemption shall be upon the defendant."

[1] NRS 171.206:

"If from the evidence it appears to the magistrate that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the magistrate shall forthwith hold him to answer in the district court; otherwise the magistrate shall discharge

appeal. I agree with the rulings of the magistrate and the district judge, and I would hold Doctor Hulse to answer the charge in the district court.

Robert C. Hulse is a doctor of medicine and licensed to practice in the State of Nevada. The evidence is uncontradicted that within a period of 7 months Doctor Hulse gave one Larry Chapman numerous prescriptions, many undated, and on some occasions as high as 8 prescriptions on a single day, for a total sum of 10,680 ten-milligram Numorphan pills. As the majority opinion recites: "Two physicians appearing as witnesses for the state testified that numorphan administered intravenously or intramuscularly was ten times stronger than morphine." The majority is troubled because "there is no [direct] evidence of the potency of morphine . . ." and therefore the record does not spell out with specificity when the number of prescriptions given constitutes bad faith on the part of the doctor. Yet the record below is clear that Doctor Hulse continued to give Chapman *multiple*, undated prescriptions for huge dosages of the potent drug, many on a single day, even after he was advised by the authorities that Chapman was an addict. Doctor Hulse kept no record of the 10,680 ten-milligram Numorphan pills he prescribed for Chapman. This evidence in the record, to me, meets the test. As this court has said so many times:

"At a preliminary examination or in proceedings before a grand jury, the issue of guilt or innocence of the accused is not involved. Marcum v. Sheriff, 85 Nev. 175, 451 P.2d 845 (1969). The evidence need not be sufficient to support a conviction. Maskaly v. State, 85 Nev. 111, 450 P.2d 790 (1969). Nor must the State produce the quantum of proof required to establish the guilt of the accused beyond a reasonable doubt. Robertson v. Sheriff, 85 Nev. 681, 462 P.2d 528 (1969). To commit an accused for trial, the State is not required to negate all inferences which might explain his conduct, but only to present enough evidence to support a reasonable inference that the accused committed the offense. Johnson v. State, 82 Nev. 338, 418 P.2d 495 (1966); Beasley v. Lamb, 79 Nev. 78, 378 P.2d 524 (1963)." Kinsey v. Sheriff, 87 Nev. 361, 363, 487 P.2d 340, 341 (1971).

I would affirm the order of the district judge denying Hulse's

him. The magistrate shall admit the defendant to bail as provided in this Title [Title 14, Procedure in Criminal Cases]. After concluding the proceeding the magistrate shall transmit forthwith to the clerk of the district court all papers in the proceeding and any bail taken by him."

petition for habeas and order that Hulse be held to answer the charge in the district court.