THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTURO ESTRADA, Defendant-Appellant.

Third District    No. 80-71

Opinion filed December 19, 1980.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Defendant, Arturo Estrada, appeals from two convictions for delivery of more than 15 grams of a substance containing heroin. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(a)(1).) The first of these deliveries occurred on February 13, 1979. The second occurred two days later, on February 15. The defendant, who was 28 years old at the time of his jury trial on these charges, was sentenced to concurrent terms of 10 and 11 years in the Department of Corrections. The jury also convicted the defendant of possession with intent to deliver more than 15 grams of a substance

containing heroin. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(a)(1).) This charge was dismissed by the court as arising from the same occurrence as the February 15 delivery. Two counts of calculated criminal drug conspiracy were tried separately by the court, and the defendant was acquitted of both charges.

The defendant's first contention on appeal is that he was improperly denied proposed jury instructions dealing with the defense of entrapment. Although the rule has been criticized (see, *e.g.*, *Sherman v. United States* (1958), 356 U.S. 369, 385, 2 L. Ed. 2d 848, 78 S. Ct. 819, (Frankfurter, J., concurring); *People v. Moran* (1970), 1 Cal. 3d 755, 463 P.2d 763, 83 Cal. Rptr. 411 (Traynor, C. J., dissenting)), both the Federal courts and the courts of our State have determined that, "unless the court could decide the issue as a matter of law, the factual issue of whether a defendant has been unlawfully entrapped is for the jury as part of its function of determining the guilt or innocence of the accused. *Sherman v. United States*, 356 U.S. 369, 377, 2 L. Ed. 2d 848, 854, 78 S. Ct. 819 (1958)." (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1027, 314 N.E.2d 647.) "The issue, therefore, before the court was whether the evidence against entrapment was so clear and convincing that it could be said as a matter of law that there was no entrapment." (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1027, 314 N.E.2d 647.) Because lack of entrapment was found by the court as a matter of law, we look at the facts in a light most favorable to the defendant. 20 Ill. App. 3d 1024, 1027.

On February 13, 1979, the defendant met Agent John Beck and Janice Bianchi, a police informant, at a Holiday Inn in Will County. There the defendant delivered slightly less than two ounces of heroin. Agent Beck paid the defendant $3,600, $1,800 for the heroin delivered on that date and $1,800 for a previous transaction. The defendant again met with Agent Beck and Janice Bianchi on February 15 at a Skelly Truck Stop. This time, the defendant himself was not in physical possession of the heroin. After a discussion with Agent Beck, the defendant joined Janice Bianchi in the restaurant. The defendant's cousin, George Estrada (who was tried separately), arrived and delivered 22 ounces of heroin to agent Beck. Both the defendant and George Estrada were then arrested. Each of these heroin deliveries was preceded by a series of telephone calls from Janice Bianchi to the defendant.

Five of these conversations were tape recorded and transcribed and are part of the record. In each of these conversations, Janice Bianchi would specify the amount of "stuff" required and the location to which it was to be delivered. For the February 15 meeting, the defendant suggested the approximate time. Janice insisted that the defendant meet the buyer personally, although the defendant was reluctant to do so. According to the defendant's testimony, these conversations were merely

the culmination in a long series of incidents in which Janice Bianchi induced him to supply her with heroin. In August 1978, the defendant met Janice Bianchi for the first time through a mutual acquaintance, a man called "Chicken." The defendant believed that Chicken was involved in drug trafficking. In October 1978, the defendant and Chicken again saw Janice Bianchi in a bar and restaurant in Chicago. When Chicken left to talk with Janice's sister, Janice began to hug and kiss the defendant and told him that she would like to see him alone sometime. The defendant agreed. She called him the following week and arranged to meet the defendant at a motel. There they engaged in sexual relations. Later, Miss Bianchi again called the defendant. The defendant's cousin gave him the key to a friend's apartment in Chicago. The defendant met with Janice Bianchi there and on subsequent occasions and engaged in sexual relations with her. It was after they started meeting in the apartment that Janice Bianchi asked the defendant for the first time if he could supply her with drugs. The defendant at first told her that he thought Chicken had some, but Janice insisted she wanted another source. The defendant agreed to ask around.

According to the defendant, his cousin George was a source of heroin, and the defendant would serve as a go-between and translator for Janice Bianchi and George. It is not clear from the testimony of any witness in this case whether Janice Bianchi at first told the defendant she wanted drugs for herself or others or what quantity of drugs were at first delivered. It is clear that at some point Janice Bianchi's interest in narcotics was, at least in part, financial. The defendant appeared to have little difficulty in obtaining 2 or even 20 ounces of heroin, although he expressed great reticence at the prospect of obtaining 40 ounces. The defendant claims that he never received any money for his deliveries of drugs to Janice Bianchi, but, on the contrary, would usually give her money each time they met. He acknowledges having agreed with George to receive $625 for the February 15 heroin delivery to Agent Beck. Agent Beck testified that Janice Bianchi became an informant for his agency on February 3, 1979. There was no other evidence of Janice Bianchi's history as a police informant. Janice Bianchi did not testify. The defendant had no prior criminal record.

In Illinois, the defense of entrapment is established by statute. Section 7—12 of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 7—12) reads:

"A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the

opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated."

It has been held by the courts that entrapment will lie only when the police officer or agent induced the commission of the crime and when the defendant has no predisposition to commit the crime charged. (See *People v. Cross* (1979), 77 Ill. 2d 396, 405, 396 N.E.2d 812.) Neither party contends that the defendant was not induced to commit this crime by a police agent. The tape-recorded conversations between Janice Bianchi and the defendant reveal that the sales for which the defendant was charged were proposed by Janice Bianchi. Miss Bianchi established the amount of drugs to be delivered and their place of delivery, with the defendant merely affirming in extremely broken English. Beyond perfunctory agreement with the plans of Janice Bianchi, the extent of defendant's declaration during the whole of the five recorded phone conversations were as follows: He indicated that he would be available for the February 15 meeting at the noon hour; he expressed fear at handling the amount of money that would be involved were the purchase to involve 40 ounces; he expressed general fear at meeting with third parties; he expressed a desire to see Janice Bianchi alone; and he wished to exchange Valentine's Day greetings with Janice Bianchi. The trial court, however, concentrated on defendant's "predisposition." The court noted the 30 or so deliveries of heroin which defendant admits to have arranged for Janice Bianchi, and the court concluded "beyond a reasonable doubt" that the defendant was predisposed to commit the crimes with which he was charged. For this reason, the court refused to tender the proposed entrapment instructions.

In the case of *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 314 N.E.2d 647, this court stated the rule, previously established by our supreme court, that the court does not weigh the evidence upon a question of whether any instruction is proper on a certain theory. Very slight evidence upon a given theory of a case will justify the giving of an instruction. (*People v. Khamis* (1951), 411 Ill. 46, 53, 103 N.E.2d 133.) It is not contended by defendant that the evidence presented at the trial is sufficient to constitute entrapment as a matter of law. Defendant contends merely that there was enough evidence to entitle him to benefit of an entrapment instruction to the jury. As we have already indicated, both the Federal courts (*Sherman v. United States* (1958), 356 U.S. 369, 377, 2 L. Ed. 2d 848, 854, 78 S. Ct. 819) and Illinois courts have determined that the factual issue, of whether a defendant has been unlawfully entrapped, is for the jury as part of its function of determining the guilt or innocence of the accused (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 314 N.E.2d 647). The Illinois Pattern Instructions, approved by our supreme court, provide an instruction defining the entrapment defense, based upon the Illinois entrapment statute, set out in this opinion. (IPI Criminal

No. 24.04 (1968).) In addition, there is a pattern instruction for those cases in which entrapment is at issue which charges a jury that the State must prove beyond a reasonable doubt all of the elements of the offense and "[t]hat the defendant was not entrapped." IPI Criminal No. 25.04 (1968).

Our supreme court recently stated that, when the defense of entrapment is raised in the circuit court, it becomes incumbent upon the State to prove beyond a reasonable doubt that entrapment did not occur. (*People v. Cross* (1979), 77 Ill. 2d 396, 401, 396 N.E.2d 812.) We interpret these words to mean, as we have previously held, that when a defendant "elected to have a jury trial and not a bench trial he was entitled to have the jury determine the validity of his entrapment defense * * *." (*People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1029, 314 N.E.2d 647.) However, in the same opinion, the supreme court stated:

> "Cross contends, however, that his conviction should nonetheless be reversed because the circuit court refused to instruct the jury on entrapment. The circuit court specifically held that defendant had not met the qualification for the defense of entrapment, and it therefore refused the tendered instruction. We find no error in the ruling. The State's evidence established beyond a reasonable doubt that Cross was predisposed to commit the offense and that the idea for the sale originated with him. *People v. Cash* (1963), 26 Ill. 2d 595, 597-98; *People v. Guagliata* (1936), 362 Ill. 427, 433." *People v. Cross* (1979), 77 Ill. 2d 396, 407, 396 N.E.2d 812.

In the first case cited therein, *People v. Cash*, the supreme court stated: "[W]e believe the undisputed testimony of the People proves that the crime originated in the mind of the defendant and that he was apprehended by lawful artifice in the execution of a criminal act of his own conception. The trial court properly refused to instruct the jury in regard to the law of entrapment, since no question of fact was presented." (26 Ill. 2d 595, 598, 188 N.E.2d 20.) In the other case cited by the supreme court in *Cross, People v. Guagliata*, the court stated: "Here the officers did no affirmative act whatever to incite or persuade the defendant to sell the morphine, but they did, as they had the right to do, afford him an opportunity to violate the statute. The court, under the evidence, would not have been justified in giving the requested instruction." 362 Ill. 427, 433, 200 N.E. 169.

As to defendant Cross, the defendant's own testimony indicated that he was predisposed to sell the heroin, and it was undisputed that the sale was originally proposed by the defendant himself. Thus, there was no evidence of any of the elements of entrapment. In light of these facts and the cases upon which the supreme court relied, we do not believe that the supreme court has, in the *Cross* case, removed the fact-finding function from the jury as to the issue of entrapment. In the absence of a specific

statement by the supreme court to the contrary, we hold that the prior law on this issue is still sound, *i.e.*, that slight evidence of entrapment is enough to require submission of the issue to the jury.

We do not agree with the trial court that the defendant's history of prior deliveries of narcotics to Janice Bianchi was determinative of the issue of predisposition. While we might agree that defendant was disposed to commit the particular deliveries of heroin for which he was convicted, this does not, under the facts of this case, establish predisposition as a matter of law. The last two deliveries of heroin are not to be considered in isolation. The deliveries were induced by Janice Bianchi, a police informer, who had been the defendant's lover for some five months. The record indicates that all known prior deliveries of narcotics by the defendant were to Janice Bianchi, that they all were at her request, and that all of these occurred subsequent to the commencement of their "love affair." "It makes no difference that the sales for which petitioner was convicted occurred after a series of sales. They were not independent acts subsequent to the inducement but part of a course of conduct which was the product of the inducement." (*Sherman v. United States* (1958), 356 U.S. 369, 374, 2 L. Ed. 2d 848, 852, 78 S. Ct. 819, 822.) The claim by Agent Beck that Janice Bianchi only became his informant on February 3 does not change this result, in the absence of any evidence as to Janice Bianchi's motivation prior to February 3. *Cf. Sherman v. United States* (1958), 356 U.S. 369, 374-75, 2 L. Ed. 2d 848, 852, 78 S. Ct. 819; *Beasley v. State* (Okla. Crim. 1955), 282 P.2d 249.

■■ It may be that the defendant was in close contact with narcotics dealers and other persons who were in the narcotics culture. While we might personally be disposed to find on the record that there was no entrapment in the cause before us, and hesitate to reverse a case solely on the ground of the failure of the trial court to give an entrapment instruction, we believe that the facts and circumstances in the cause before us are such that the omission to give the entrapment instruction requires a reversal and remandment of this cause. *People v. Carpentier* (1974), 20 Ill. App. 3d 1024, 1029, 314 N.E.2d 647.

The defendant argues that, upon reversal, this cause should not be remanded for retrial because overreaching by the prosecutor at his trial bars his retrial on grounds of double jeopardy. The defendant had his trial severed from that of his cousin, George Estrada. Defendant's first trial ended in mistrial because the jury had been exposed to a radio broadcast which related that George Estrada had been convicted for his participation in the drug transfers and that the estimated street value of the drugs was $200,000. At defendant's second trial, the one from which he is now appealing, the prosecution's first witness was Agent Beck. While establishing the chain of custody of the heroin, Agent Beck revealed that the heroin

was out of his vault during the trial of George Estrada. After defendant's objection to this testimony, the trial judge gave the prosecutor a severe lecture, accusing him of intentionally bringing before the jury evidence he knew to be prejudicial. Ultimately, however, the court concluded that the testimony was harmless. With this conclusion we agree. One of the defendant's contentions at trial was that George was the heroin trafficker and the defendant served merely as a go-between and translator. That the jury should be informed that George was also charged in connection with this incident in no way prejudiced the defendant. The result of George's trial was never elicited.

Later in the trial, outside of the presence of the jury, a conference was held on the admissibility of the tape-recorded telephone conversations between the defendant and Janice Bianchi. The court ruled the tapes inadmissible on the grounds of inadequacy of foundation. After the jury returned, Agent Malinowski testified for the State. He was questioned regarding the tape recordings of the conversations between Janice Bianchi and the defendant and regarding a tape recording of a conversation between the defendant and John Beck at the Skelly Truck Stop on February 15. Agent Malinowski testified as to the functioning of the recording device and as to the chain of custody of the tapes. The defendant objected, seeing, quite accurately, where this line of questioning was leading. Because the Truck Stop tape was also referred to, the court allowed the questioning to continue. The Truck Stop tape had not been ruled inadmissible. The prosecutor then moved, in the presence of the jury, to admit the tapes of the telephone coversations. At defendant's request, a side-bar was held, which lasted the rest of that day and all of the next.

The defendant argued that the prosecutor had engaged in intentional misconduct in order to prejudice the defendant in the eyes of the jury. The defendant claimed that, despite knowing the evidence to be inadmissible, the prosecutor wanted to impress upon the jury that the defense was trying to keep evidence from them. The prosecutor argued that he was still convinced his position on the admissibility of the tapes was correct and that he was under the impression that he could make an offer of proof in the presence of the jury. The court ordered a mistrial, but did not excuse the jury. The court found that the prosecutor's misconduct was unintentional. More arguments were held on the admissibility of the tapes. The court then concluded that its first decision as to their admissibility had been erroneous and that a proper foundation had been established. Because the tapes were admissible, the court concluded, an offer to admit them was not prejudicial to the defendant. The declaration of mistrial was rescinded and the trial continued.

⊛ 4 Because of our reversal of this cause on the grounds of improper jury

instruction, we do not reach the issue of whether the prosecutor's methods of getting the tapes into evidence prejudiced the jury. We do, however, need to examine the issue of whether the prosecutor's conduct constituted such overreaching as to bar retrial of this defendant on the grounds of double jeopardy. The conduct of the prosecutor in ignoring the order of the court and offering into evidence, in the presence of the jury, items that had just moments before been declared, in no uncertain terms, inadmissible, was inexcusable. That the order so ignored was erroneous in no way excuses his behavior. We shall, however, defer to the trial court's judgment that the actions of the prosecutor were not intended to prejudice the jury, but were merely demonstrative of the prosecutor's obtuseness, charitably referred to by the trial court as single-mindedness. ■■ Furthermore, this is not the type of situation which bars reprosecution on double jeopardy grounds. We recently held that, even were it true that the prosecutor intentionally engaged in prosecutorial misconduct in an effort to obtain a conviction, the defendant cannot avail himself of double jeopardy protection for this reason alone.

> "To obtain the protection of the double-jeopardy clause in a case such as this, the intent of the prosecutor in overreaching must be to obtain a premature termination of the proceedings by forcing the defendant to move for a mistrial. Unless the prosecutor's misconduct was a ploy to force the defendant to move for a mistrial, and thereby obtain an opportunity to prosecute the defendant a second time, overreaching to obtain a conviction, although not to be condoned, does not itself foreclose reprosecution." (*People v. Gomez* (1980), 84 Ill. App. 3d 785, 788, 406 N.E.2d 886, 888.)

It is not here contended that the prosecutor acted with the intent of eliciting a mistrial in order to avoid an acquittal in this case.

The defendant argues that the rule barring reprosecution in cases of prosecutorial overreaching is not so limited. He cites us to *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 593, 394 N.E.2d 496, wherein it is stated:

> "Overreaching is typically defined as prosecutorial or judicial misconduct: (1) which is specifically designed to provoke a mistrial in order to secure a second—and perhaps more favorable—opportunity to convict the accused [citations]; or (2) which is motivated by bad faith or undertaken to harass or prejudice the accused * * * ."

We note, however, that *Pendleton* involved a case in which the prosecution's case was "going badly" because of the failure of the complainant to identify the defendants. There, the prosecutors coached the witness, during a trial recess, while she was still in the midst of her testimony. The

court stated: "It would be offensive to the constitutional guaranty against successive, oppressive prosecutions, if the State, at a trial in which its case was going badly, could, by such misconduct, precipitate a mistrial and thereby gain another more favorable opportunity to convict the accused." The court then went on to cite a case from another jurisdiction which referred to the subtle changes in testimony that prosecution witnesses may present on retrial. We, therefore, do not find *Pendleton* to contradict our statement in *People v. Gomez*. In the case at bar there was no showing that the prosecutor so feared acquittal that he was willing to risk retrial in hopes of being able to present a stronger case. The commission of prejudicial error, in an effort to gain a conviction at the initial trial, is all too commonly the precipitating cause of reversal. The usual remedy is remandment for retrial.

■■ Upon remandment, the trial court will need to consider the admissibility of the taped telephone conversations between Janice Bianchi and the defendant. These conversations occurred between February 12 and February 14, 1979. The defendant argues that the tapes are inadmissible because there exists no foundation adequate to establish that the tapes are, in fact, what they are reputed to be. Specifically, he asserts that no witness at this trial was able to say that he heard Arturo Estrada's side of the conversation and that the tape accurately represents what Arturo Estrada said. The police agents who testified in this case could only testify that they heard Janice Bianchi's side of the conversation, and that her words were accurately recorded on the tapes. No police officer listened in on the conversation while it took place. There is no dispute as to the identity of the parties to the conversation. The defendant acknowledges that the police agents could accurately identify his voice as that on the tape. The defendant argues that the only person who could testify to the accuracy of the recording of Arturo Estrada's words was Janice Bianchi, and that she, although available, did not testify. We agree with the defendant that the better practice would be to establish the authenticity of a tape through the testimony of one who heard both sides of the conversation. Such testimony would have to be provided by one who either was a party to the conversation or who eavesdropped on both sides of the conversation, *e.g.*, by listening over headphones, as the conversation occurred. However, a failure to produce such a witness need not preclude the admissibility of the recordings. Proper foundation may be established through evidence of the mechanical capabilities of the recording machine plus evidence of a secure chain of custody. (E. Cleary and M. Graham, Handbook of Illinois Evidence §901.6 (1979).) The Federal courts have established the elements of such a foundation. They are:

> (1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording has been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith without any kind of inducement.

*United States v. McMillan* (8th Cir. 1974), 508 F.2d 101, 104; *United States v. Hassell* (8th Cir. 1977), 547 F.2d 1048.

The defendant does not claim the absence of any of these foundation requirements. He merely asserts that the State has failed to show that the tape has not failed to record accurately every word spoken by the defendant. At the hearing *in limine*, the defendant did not assert which, if any, of the words that the defendant spoke were not accurately recorded on the tape. "While proof of facts creating a sufficient foundation for the admission of a tape recording is a matter to be decided by the trial court, it does not have unbridled discretion to disregard the problems inherent in the use of such evidence." (*United States v. Starks* (3rd Cir. 1975), 515 F.2d 112, 121.) "[T]he burden is on the government 'to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings.' " (515 F.2d 112, 121.) "When a colorable attack is made as to a tape's authenticity and accuracy, the burden on those issues shifts to the party offering the tape." (515 F.2d 112, 122.) At the defendant's trial, undisputed testimony was presented as to all of the foundation requirements listed above except that it was never affirmatively established that the recording was "correct." (See foundation requirement (3) above.) In the absence of testimony by one who has heard both sides of the conversation, it would be impossible to show that the recording was "correct." Professors Cleary and Graham, in their Handbook on Illinois Evidence, at section 901.6, writes that the foundation can be established through testimony as to (1) capability of the device for recording, (2) competency on the operator, (3) proper operation of the device, (4) preservation of the recording with no changes, additions, or deletions, as well as (5) identification of the speakers. Also, chain of custody must be established. The text writers, therefore, do not think it necessary for the State to affirmatively show that the records are "correct" in order to establish the proper foundation for their admission into evidence.

■ We therefore conclude that, in the absence of a colorable claim that

the tapes failed to accurately record all of the words audibly spoken by the defendant, the State need not prove that the device did, in fact, record every audible word spoken by the defendant. If such proof becomes necessary, it may be established by circumstantial evidence, such as a demonstration of the sensitivity and reliability of the recording device and the absence of gaps in the recorded conversation. The other foundation requirements we have listed deal adequately with the problem of physical tampering. Contrary to defendant's assertion, Janice Bianchi was not the only witness to both sides of the recorded conversation. The defendant himself was such a witness. He, therefore, will have the opportunity of raising a colorable attack on the "correctness" of the recording when the cause is retried.

It is necessary to consider the defendant's other contentions of error.

For the reasons stated in this opinion, the convictions and sentence of defendant for two counts of delivery of a controlled substance are reversed and the cause is remanded to the Circuit Court of Will County for retrial.

Reversed and remanded.

STOUDER and SCOTT, JJ., concur.