THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHEN WIELGOS, Defendant-Appellant.

First District (3rd Division) No. 1—87—3688

Opinion filed October 18, 1989.

Edward M. Genson and Marc W. Martin, both of Genson, Steinbeck & Gillespie, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Paul Gliatta, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Stephen Wielgos, was charged by information with delivery of more than 30 grams of a controlled substance, *i.e.*, cocaine. (Ill. Rev. Stat. 1983, ch. 56½, par. 1401(a)(2).) A jury convicted defendant, and the trial court sentenced him to six years' imprisonment. Defendant appeals.

Eric Bjankini, a Northeast Metropolitan Enforcement Group undercover narcotics agent, in the summer of 1985, testified for the State. Working undercover as "Steve Hilton," Bjankini met with Edward Ruschinski on June 12, 1985, to discuss the purchase of cocaine. Ruschinski told Bjankini that he had access to cocaine. Three days later, Bjankini and Ruschinski again discussed the purchase of narcotics. Bjankini told Ruschinski that if he wanted to negotiate any transactions he could contact Bjankini via his pager. A week later, Ruschinski contacted Bjankini and asked if he was still interested in purchasing narcotics. Bjankini responded that he was, that he was always looking for a new supplier and that he would be willing to purchase whatever Ruschinski could get for him. Ruschinski told Bjankini that "he had a possibility of getting multiple ounces of cocaine" but did not name his source. Bjankini told Ruschinski to call him and let him know how much he could get and the price. Ruschinski contacted Bjankini a week later and told him that it looked like "we" would be able to get four ounces of cocaine around the 4th of July for $8,600.

Ruschinski contacted Bjankini on July 3 and informed him that he could get him four ounces of cocaine that day for $8,600. Bjankini picked Ruschinski up later that day and drove to the area of 70th and Harlem. During the drive, Bjankini and Ruschinski spoke about the impending transaction, about the fact that they would both benefit financially therefrom, about the fact that future transactions would be mutually beneficial, that "this could be a lucrative business" and that they "could have a long[,] permanent partnership." Ruschinski directed Bjankini to 6128 West 80th Place in Burbank, Illinois, and they were admitted by defendant into his home. Bjankini introduced himself to defendant as "Steve Hilton" and informed him that he was interested in purchasing four ounces of cocaine. Defendant told Bjankini that he did not have the cocaine at that time, that Bjankini should return in half an hour and that there was a possibility that he would have it at that time. While in his home, neither Bjankini nor Ruschinski threatened defendant.

After leaving defendant's home, Bjankini had Ruschinski count the $8,600. Upon returning, defendant informed Bjankini that his

"connect" or supplier had nine ounces of cocaine but could not drop off the amount defendant had ordered because the supplier was at the Taste of Chicago festival. Bjankini told defendant that he was always interested in a new supplier, that he would still like to purchase more cocaine, that, if the cocaine came later that evening, Ruschinski could take possession and that he would get it from him. After defendant told Bjankini that he would try to get the cocaine on Friday, Bjankini left and Ruschinski stayed with defendant.

Ruschinski informed Bjankini on July 5 that defendant was having trouble getting the cocaine. Bjankini told Ruschinski to give defendant his pager number so that Bjankini could talk to him directly. Thereafter, Bjankini was paged with the code he had given Ruschinski for defendant. Bjankini called defendant, and defendant told him that he would be going over to his "connect's" house about 3:30 p.m. to get the okay to pick up the cocaine. Bjankini called defendant later and told him that he would be at his house at 3:45 to pick up the cocaine. Bjankini then called Ruschinski and told him he would meet him at 79th and Mobile at 3:30. Defendant paged Bjankini at 3:45 to tell him that he was on his way to pick up the cocaine.

After meeting Ruschinski, Bjankini had him count the $8,600 to be paid defendant for the cocaine. Upon arriving at defendant's home, defendant led them into the kitchen, and Bjankini observed a scale, some plastic "baggies" and a mound of white powder on a plate on the kitchen table. Defendant told Bjankini that "it was quality coke," and that "the weight was exact." He also asked Bjankini if he wanted to "zero out the scale," which meant to set the weight on the scale before weighing at no weight. Bjankini weighed the cocaine and informed defendant that it was correct. Ruschinski then advised defendant that he had counted the money and that it was in Bjankini's car. Bjankini took the cocaine, walked out to his car and gave a prearranged arrest signal. He and the team of agents surveilling the scene placed defendant and Ruschinski under arrest.

Defendant testified in his own behalf. In the summer of 1985, defendant was unemployed and was living with his mother. At that time, he had known Ruschinski for almost three years as a friend. Defendant had known Tony Creagh all of his life. Defendant denied ever having used, delivered or sold cocaine before June 1985. At that time, Ruschinski began telephoning defendant and asking for Creagh's phone number because he wanted to buy some cocaine from him. Defendant told Ruschinski that he did not "want to have any part of it." Between June and July 3, Ruschinski called defendant about 25 times and visited him about seven times. In one day during

that period, Ruschinski called defendant five times. Ruschinski wanted defendant "to get a hold of [Creagh] for the purchase of cocaine." Defendant did not put Ruschinski in touch with Creagh nor did he agree to do anything with Ruschinski.

When Bjankini and Ruschinski came to his home on July 3, Bjankini asked defendant if the four ounces of cocaine were there. He also told defendant that he could make large amounts of money. Defendant responded that he did not have the cocaine and did not want any part in dealing with Bjankini and Ruschinski. Ruschinski, who was very upset, told defendant he thought the "arrangements were going to be worked out that day with Steve." Ruschinski also shook defendant by the shoulders and told him "that Steve had warned him and told him that it better be there that day." Ruschinski also told defendant "that Steve carried a gun at times." In response to defendant's statements, Bjankini asked defendant what was going on and said he "thought it was going to be here today." Bjankini also asked defendant whether he had gotten hold of Creagh. Defendant responded that he had not. Ruschinski again told defendant "that he meant business" and "[t]hat he wanted these four ounces of cocaine."

Defendant then told Bjankini and Ruschinski that he would contact Tony and for them to come back in half an hour. However, defendant did not call Creagh. When Bjankini and Ruschinski returned, they again told defendant that he could make thousands of dollars and asked if he "was going to set them up with Tony." Defendant again refused. Defendant had made no arrangements prior to this meeting to supply or deliver any cocaine to Bjankini or Ruschinski and never had any intention to do so. After Bjankini left defendant's home, Ruschinski asked defendant to take him to Creagh's house and defendant agreed. However, Creagh was not home. Defendant had not decided to deliver any cocaine to Bjankini when he returned from Creagh's house. He decided to do so later that evening when Ruschinski called him and told him that Steve was threatening Ruschinski and telling him that "his people were waiting for this product" and that "he was very fed up with it." Ruschinski also told defendant that he was in a bad situation and needed defendant's help. Thereafter, defendant called Creagh.

Upon calling Creagh, defendant told him that he knew that he dealt cocaine, that he knew someone interested in buying four ounces and that he wanted to send Bjankini and Ruschinski to his house. After telling defendant that "he didn't want any part of anyone he didn't know," Creagh agreed to "do the four ounces of cocaine" directly with defendant and told him "that if [he] did this for him, ***

[he] would make a lot of money as well." Creagh and defendant then agreed on a price of $7,500 for the cocaine. Defendant spoke with Ruschinski on the morning of July 5. Ruschinski told defendant he would bring a scale to defendant's home because it would be needed that afternoon.

Defendant spoke with Ruschinski again in the afternoon and told him that he was scared, wanted to change his mind about doing the transaction and did not want any part in it. Ruschinski told defendant "that Steve would definitely do something" to both of them. He also told defendant to contact Bjankini via his beeper. Upon doing so, defendant told Bjankini that the transaction would take place around 4 p.m.

On cross-examination, defendant testified that he decided to take part in the transaction because he felt threatened. He was pressured very heavily by both Bjankini and Ruschinski. When he spoke with him on July 5, Ruschinski told him that Bjankini was waiting for the cocaine and that, if he did not "come through with it, certain things would be happening."

OPINION

On appeal, defendant chiefly asserts that a new trial is required due to: (1) the State's failure to tender, during discovery, statements which its witnesses testified defendant made during his arrest; and (2) prosecutorial misconduct during the course of his trial. However, we find no need to address those contentions of error inasmuch as we find dispositive the third error alleged, *viz.*, the trial court's failure to instruct the jury properly on the defense of entrapment.

Defendant tendered two instructions on the defense of entrapment. The first stated, *inter alia*, that it was a defense to the offense charged that defendant was entrapped, *i.e.*, "that for the purpose of obtaining evidence against [him], he was incited or induced by a public officer and/or agent of a public officer to commit an offense." (Illinois Pattern Jury Instructions, Criminal, No. 24—25.04 (2d ed. 1981).) The language of this instruction tracked the statute codifying the defense of entrapment. (Ill. Rev. Stat. 1983, ch. 38, par. 7—12.) The second instruction substituted the names of Bjankini and Ruschinski in the appropriate places in the first instruction. The trial court rejected defendant's entrapment instructions and charged the jury with the State's instruction on the defense, which omitted the "and/or agent of a public officer" language of defendant's first instruction.

Defendant asserts that, in rejecting the tendered instructions, the trial court rejected the defense theory of vicarious entrapment and

committed reversible error.

■ A defendant is entitled to a jury instruction on any defense which is supported by even very slight evidence. (*People v. Bradshaw* (1981), 100 Ill. App. 3d 45, 426 N.E.2d 345; *People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017.) This rule applies to the entrapment defense. *People v. Estrada* (1980), 91 Ill. App. 3d 228, 234, 414 N.E.2d 512.

■ Applying this very liberal standard, we conclude that the evidence in this case was sufficient to warrant inclusion of the language omitted by the trial court from the entrapment instruction. ,

Specifically, we find that Bjankini's own testimony amply revealed that Bjankini, a public officer, employed Ruschinski, albeit unwittingly, as his agent for the purchase of cocaine from third parties in general and from defendant specifically. (*Cf. People v. Gorski* (1986), 144 Ill. App. 3d 284, 494 N.E.2d 246 (a police informant was not a police agent where he acted merely as an initial means of introduction to the defendant and did not contribute further to her arrest).) Moreover, defendant's testimony was sufficient to have supported a jury finding that Ruschinski incited or induced defendant to deliver cocaine to Bjankini, had the jury been properly instructed.

Beyond the fact that the evidence was sufficient to reveal that Ruschinski acted as Bjankini's agent and that Ruschinski induced or incited defendant to deliver cocaine to Bjankini, the instruction tendered by defendant was proper as a matter of law.

As noted above, section 7—12 of the Criminal Code of 1961 establishes that a defendant may be entrapped by an agent of a public officer or employee as well as such officer or employee. (Ill. Rev. Stat. 1983, ch. 38, par. 7—12.) Moreover, while no Illinois case has reviewed the propriety of a jury instruction on entrapment where, as here, the alleged agent of a public officer or employee acted unwittingly, *i.e.*, without the knowledge that his principal was a public officer, some Federal courts have approved an entrapment defense in such cases.

In *United States v. Anderton* (5th Cir. 1980), 629 F.2d 1044, the defendant tendered a jury instruction defining the term "law enforcement officer," used in a standard entrapment instruction, as including any person acting solely for or on behalf of a person actually in the employment of a Federal or State agency in the pursuit of such occupation. The trial court instructed the jury, instead, that entrapment occurred when law enforcement officers or their agents induced the commission of a crime but that a private citizen who was not a government officer or agent thereof could not commit entrapment. In reversing the defendant's conviction based on error in the jury instruc-

tion, the *Anderton* court held that a person who was "an ignorant pawn of the government" could commit entrapment. *Anderton*, 629 F.2d at 1047.

Similarly, in *United States v. Valencia* (2d Cir. 1980), 645 F.2d 1158, the court held that, "[i]f a person is brought into a criminal scheme after being informed indirectly of conduct or statements * * * which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly." (*Valencia*, 645 F.2d at 1168.) The court also held that the third party who induces the defendant may be an unwitting agent. *Valencia*, 645 F.2d at 1169 n.11.

■ Admittedly, the majority of Federal Courts of Appeal do not recognize the defense of vicarious entrapment. (See *United States v. Leroux* (8th Cir. 1984), 738 F.2d 943, 947-48 (and cases cited therein).) However, we believe that the plain and unambiguous language of section 7—12 of the Criminal Code must be read as allowing that defense in Illinois.

Section 7—12 provides, *inter alia*, that "[a] person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either." (Ill. Rev. Stat. 1983, ch. 38, par. 7—12.) The statute does not require that the agent of the public officer or employee know the true identity of the public officer or employee. Moreover, it does not require that the agent communicate only inducements flowing directly from or originating with the officer or employee. Thus, the latter requirement, which the Federal courts impose in determining whether an entrapment defense is valid, is inapplicable in Illinois. See *United States v. Pilarinos* (2d Cir. 1988), 864 F.2d 253, 256 (a derivative entrapment defense is proper where the government's inducement is directly communicated to a defendant by an unwitting middleman, not where the middleman induced to commit a crime by the government, responding to the pressure upon him, takes it upon himself to induce the defendant to participate in the crime).

Giving effect to the plain and unambiguous language of the statute has the salutary result of recognizing that entrapment does not turn on the government's control of every detail of the discussions between its unwitting middlemen and defendants but, rather, that, once the government employs unsavory characters as such to ferret out crime, it should be fairly charged with responsibility for their actions. *United States v. Anderton* (5th Cir. 1980), 629 F.2d 1044, 1047; see also Note, *Entrapment Through Unsuspecting Middlemen*, 95 Harv. L. Rev. 1122, 1128 (1982) (restriction of entrapment defense to secondary targets induced to commit crime by middlemen operating un-

der the firm direction of government agents undervalues government's role in creating opportunities to engage in illegal activity that must involve other persons).

Moreover, the State offers no cogent reason for holding otherwise in this case. The State argues that the jury was properly instructed on the defense of entrapment based upon the evidence presented at trial. Specifically, it asserts that, based upon the evidence, Ruschinski was not an agent of the police but rather a friend of defendant who merely solicited him to help Ruschinski commit the crime. It concludes that, as Ruschinski was neither a public officer nor agent thereof, but, rather, defendant's accomplice and codefendant, defendant was not entitled to the rejected instructions. Beyond the fact that our review of the evidence persuades us otherwise, we must note that neither of the cases the State cites for its latter conclusion, *People v. Jarvis* (1987), 158 Ill. App. 3d 415, 511 N.E.2d 813, and *People v. Miller* (1980), 90 Ill. App. 3d 422, 413 N.E.2d 143, in any way supports it.

■■ The State also asserts that defendant's alleged use of the phrase "zero out the scale" and the fact he was able to procure a large amount of extremely pure cocaine, 92%, in a short period of time reveal that he was entrapped by no one and was, instead, predisposed to commit the crime charged. We cannot agree that this evidence justified rejecting defendant's entrapment instructions.

Defendant denied that he used the phrase "zero out the scale." That the jury found him guilty does not require the conclusion that it also resolved this dispute against him. More importantly, we cannot agree that obtaining four ounces of cocaine which is 92% pure in a short amount of time necessarily reveals a predisposition to commit the crime charged because, as the State implies, defendant had committed it in the past. This fact would reveal criminal predisposition only if Bjankini had explicitly sought extremely pure cocaine. In that case, obtaining 92% pure cocaine would reveal a familiarity with the criminal underworld of narcotics and narcotics peddlers and a predisposition to participate therein. But where, as here, the buyer does not stipulate the purity of the narcotics sought and it does not appear that the defendant was aware of the purity of the narcotics supplied, delivering such pure cocaine reveals nothing with respect to familiarity with that underworld and predisposition.

■■ The State also contends that, in enacting section 7—12, the legislature did not intend to recognize the defense of vicarious entrapment. While this argument presents a difficult question theoretically, it does not do so practically as the State fails to cite any authority in

support and to address the recognition of the defense in Federal jurisprudence. Entrapment is defined in Illinois essentially as it was in *Sorrells v. United States* (1932), 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210. (Ill. Ann. Stat., ch. 38, par. 7—12, Committee Comments—1961, at 441 (Smith-Hurd 1989).) Given that fact, the recognition of vicarious entrapment as a valid defense in Federal case law, the plain and unambiguous language of section 7—12 and the State's aforementioned failures, we are compelled to conclude that the defense is valid in Illinois.

For all the foregoing reasons, defendant's conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded.

WHITE and CERDA, JJ., concur.