THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ELMER ALEXANDER, Defendant-Appellant.

Second District   No. 2—92—0501

Opinion filed September 2, 1993.

G. Joseph Weller, of State Appellate Defender's Office, and Anne S.
Quincy, both of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and
Lisa A. Hoffman, both of State's Attorneys Appellate Prosecutor's Office,
of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

A jury found defendant, Elmer Alexander, guilty of one count of
the unlawful delivery of at least 15 grams but less than 100 grams of
a substance containing cocaine, a controlled substance. (Ill. Rev. Stat.
1991, ch. 56½, par. 1401(a)(2)(A) (now 720 ILCS 570/401(a)(2)(A)
(West 1992)).) After entering a judgment on the verdict, the court de-
nied defendant's post-trial motion and sentenced him to eight years'
imprisonment. On appeal, defendant argues he is entitled to a new
trial because the court erroneously refused to instruct the jury on the
defense of entrapment. See Ill. Rev. Stat. 1991, ch. 38, par. 7—12

(now 720 ILCS 5/7—12 (West 1992)); see also Illinois Pattern Jury Instructions, Criminal, Nos. 24—25.04, 24—25.04A (3d ed. 1992).

We hold that the evidence entitled defendant to raise the entrapment defense. We reverse and remand for a new trial.

On January 24, 1991, defendant procured a substance containing cocaine and delivered it to undercover police officer Mark Fritz, who was posing as the brother-in-law of Dennis Tennin. Tennin, a friend of defendant, was a confidential informant who introduced defendant to Fritz on January 18, 1991, at which time defendant also delivered cocaine to Fritz. Defendant was indicted for the January 24, 1991, transaction. His first trial ended in a mistrial and he was retried.

Mark Fritz was the State's principal witness. In January 1991, he was working undercover for the State Line Area Narcotics Team (SLANT) in Rockford. He was assigned to purchase drugs from defendant, who he knew was Tennin's long-time friend. Tennin also told him defendant was a dealer for Carrie Woods, a leading Rockford cocaine supplier. Defendant's acquaintance with Woods was the main reason SLANT pursued defendant.

On January 18, 1991, Tennin (for a $100 fee from SLANT) introduced Fritz to defendant, who was known as "Bader," at defendant's home at 512 Hill Street in Rockford. At trial, Fritz did not recall whether Tennin had telephoned defendant earlier that day to set up the meeting. Tennin told defendant that the officer was Tennin's brother-in-law from Sterling and that Fritz wanted defendant to supply him with cocaine. Defendant told Fritz that he could obtain all the cocaine Fritz wanted, and he quoted some prices to Fritz. Fritz told defendant he wanted a quarter-ounce of cocaine; defendant insisted on a price of $400. Fritz gave defendant $350 and told him to get what he could. Defendant did not hesitate in agreeing to buy drugs for Fritz.

Defendant and Fritz got into Fritz's car. At defendant's direction, Fritz drove to 724 Concord Avenue. Fritz knew this was rumored to be Carrie Woods' drug house. Defendant entered the house and returned with a package of cocaine. When Fritz remarked that the package was heat-sealed, defendant replied that this packaging was the trademark of "Seal-a-meal." After the transaction, Fritz said he would like defendant to obtain larger amounts (a half-ounce or an ounce) for him in the near future. Defendant quoted prices for these amounts, which are amounts purchased by dealers rather than by mere users. Defendant said they could set up a deal with Tennin's assistance.

Fritz next met defendant at defendant's house at about 11:18 a.m. on January 24, 1991. Fritz had paid Tennin $150 to call defendant earlier that day to arrange the meeting. Tennin called defendant at least once that morning before Fritz showed up. After Tennin told Fritz that defendant was willing to deal, Fritz went alone to defendant's house. Fritz explained that he did not bring Tennin along because Tennin had "ripped [him] off" earlier. Fritz told defendant he wanted to buy an ounce of cocaine. Defendant said it would cost $1,400; he refused to negotiate a lower price. As on January 18, defendant expressed no reluctance to deal, and he was sure that he could procure the requested amount of cocaine.

After they agreed on the price, defendant and Fritz went to Fritz's car. Fritz told defendant he would like to work directly with defendant, and he asked defendant how they could get in touch when needed. Without hesitation, defendant told Fritz that he would give Fritz his telephone number. Defendant wrote down the number on a napkin Fritz supplied.

Defendant told Fritz he would take him to one of defendant's suppliers. At defendant's direction, Fritz drove to Blake Street. Defendant said he would get cocaine from a "Mexican." Defendant soon returned and said the Mexican was not around. He offered to take Fritz to another dealer known as "Seal-a-meal."

At defendant's direction, Fritz drove to 724 Concord Avenue. Noticing there were no vehicles in the driveway, defendant instructed Fritz to drive to a white building about two blocks north of 724 Concord. Defendant entered the building and returned. He said that the people there had only three "eight-balls" (or eighth-ounces of cocaine). Fritz wanted an ounce. Defendant directed him to Oakwood Avenue, where a relative of Seal-a-meal lived. However, defendant could not get cocaine at this address; so at defendant's direction, Fritz drove back to 724 Concord to see if Seal-a-meal had returned.

As the car approached the intersection of Albert Avenue and West State Street, defendant spotted a young woman whom he identified as another relative of Seal-a-meal. Fritz pulled over at defendant's request. Defendant and the woman spoke briefly, then went to a residence at 115 Albert. When he returned to Fritz's car, defendant said that the woman had no cocaine to sell. Fritz recognized the woman as Ellen Woods, a relative of Carrie Woods. Defendant directed Fritz back to Seal-a-meal's house at 724 Concord. When they arrived, the parking lot was crowded. Defendant said the place was "in business."

Fritz parked a block away as defendant entered the residence. Fritz soon drove up to get defendant, who, upon exiting the house,

told Fritz that in 10 minutes their supplier would provide them with 15 packets of cocaine. At defendant's instruction, Fritz drove to a nearby convenience store and soon returned to 724 Concord. At about 12:25 p.m., defendant entered the house and returned with the promised cocaine, which was in 15 individually sealed packets on a strip of plastic. Defendant then asked Fritz to drop him off at a house on Blake Street. Defendant had not tried to back out of the deal at any time.

As he let defendant out at Blake Street, Fritz told defendant he was not happy with having to drive around for an hour to find cocaine. He said he would like to expedite the procedure the next time. Defendant told Fritz to call a day ahead next time and there would be less delay.

Fritz testified that defendant never initiated a drug deal with him. Defendant never sold any cocaine from his own house. Both deals with Fritz were arranged via Tennin on Fritz's initiative. Defendant made no money from these deals.

Charles O'Brien, one of the SLANT agents who provided surveillance for both deals, corroborated Fritz's testimony about the sequence of events on January 24, 1991. After defendant left Fritz, the officers went to headquarters, where Fritz showed O'Brien the 15 packets of cocaine he had received from defendant.

Defendant testified that he was 39 years old and had lived in Rockford all his life. He had long been nicknamed "Bader." Defendant had been married 12 years. He had two stepchildren and one child of his own. Two children lived at home with defendant. One, who was 18 years old, had severe congenital brain damage. Defendant had been a city maintenance worker until he was injured in 1984. Since then, he had been collecting disability benefits.

Defendant stated that he was attempting to overcome a lengthy addiction to cocaine. He started using marijuana and cocaine in 1983. He used cocaine whenever he had money to buy it. He had been treated unsuccessfully in 1983 and in 1989. The last time he used cocaine was in September 1990.

Defendant explained that he was a recovering cocaine addict, but he was not a drug dealer. His knowledge of drug terminology and of the Rockford drug trade resulted from his long use of cocaine. He had been "best friends" with Dennis Tennin since grade school. After Tennin married, they saw less of each other. However, they soon became close again, partly because they often bought and used drugs together. Their families knew one another and visited each other. In recent years, defendant had consumed cocaine with Tennin and Tennin's

girlfriend, Rachel Lumkins. Defendant had also had sexual relations with Lumkins.

Defendant testified that Tennin used their friendship to induce him to engage in both January 1991 drug transactions. At about 8:30 a.m. on January 18, Tennin called defendant and said that Tennin's "brother-in-law" was in town and wanted to buy cocaine. As Tennin owed Carrie Woods money from a drug deal, he asked defendant to buy the requested drugs. After convincing defendant that his "brother-in-law" was not a police agent, Tennin urged defendant to do the deal out of friendship; after all, he would do a favor for defendant if defendant asked.

With some prodding, defendant agreed to do the requested favor partly because Tennin was a close friend and partly because Tennin told him defendant knew Tennin had "something on [him] anyway"— that is, Tennin knew about defendant's sexual relations with Lumkins. Defendant feared that Tennin might tell defendant's wife about defendant's relations with Lumkins. Without the motivation from Tennin's friendship and threats, defendant would not have agreed to procure cocaine for Tennin's "brother-in-law." He never sold cocaine from his house and he never asked Tennin or Fritz to visit him to buy drugs.

Tennin called defendant several times that morning to insist that defendant wait for him. Defendant was scheduled to take some elderly people to a food pantry, and he left the house about 10:15 a.m. Just then, Tennin and Fritz pulled up. Tennin told defendant to get into the car. Fritz was the driver. Tennin introduced defendant to Fritz, describing Fritz as Lumkins' brother-in-law and a drug dealer from Sterling.

The three men rode off in search of cocaine. Fritz never asked about prices and defendant never quoted him any. Tennin suggested they visit Carrie Woods at 724 Concord. Defendant knew Woods was a drug dealer. He, Tennin, and Woods grew up together. Defendant had never helped Woods sell drugs before. He started to give directions to 724 Concord. Fritz replied that he knew a shortcut to 724 Concord, and he took it there.

Fritz parked outside 724 Concord. He gave defendant $350 and told him to buy what he could with the money. Defendant bought four small packages of cocaine from Woods and returned to the car. He gave the packages to Tennin, who gave them to Fritz.

At about 10 a.m. on January 24, Tennin called defendant again, relating that Fritz was back in town to get an ounce of cocaine. Tennin called two or three times that morning, eventually telling defend-

ant Fritz would come alone to defendant's house. Defendant was reluctant to wait, but Tennin reminded him that, if he did not comply, defendant's wife would learn about defendant's sexual relations with Lumkins. Before Tennin called that morning, defendant had no intention of buying cocaine. He had never before purchased an ounce of cocaine at a time.

Fritz arrived just past 11 a.m. and stayed outside defendant's residence. As Fritz arrived, defendant was leaving the house to meet some friends for "a beer or something." At Fritz's request, defendant got into Fritz's car. Fritz confirmed that Tennin had told defendant Fritz's plans. At trial, defendant testified that, as of January 24, 1991, he did not know the price of an ounce of cocaine; thus, he never quoted any prices to Fritz. He did not recall testifying earlier that he told Fritz an ounce of cocaine would cost about $1,200 to $1,500.

Defendant's account of the events of January 24 differed somewhat from Fritz's account, particularly in the degree of initiative and familiarity with Rockford drug dealers that he ascribed to Fritz. According to defendant, Fritz told defendant that he had $1,300 to spend on however much cocaine he could get. Fritz drove from 512 Hill Street right to 724 Concord without any directions from defendant. Fritz did not drive to Blake Street first. When the two arrived outside 724 Concord the first time, Fritz told defendant, "that's the Seal-a-meal man." Defendant went to the house and knocked on the door, but a woman there told him that Carrie Woods was not home. Defendant returned to the car. Defendant and Fritz then rode up Concord, where defendant directed Fritz to another house. Nobody was home. Defendant returned to the car and told Fritz that the people there could supply only three "eight-balls." Defendant's experience as a cocaine user familiarized him with this term of the trade.

Defendant asked Fritz to take him to a house on Blake Street. Although he did not so inform Fritz, he wanted to go there to keep a promise to help move furniture in return for some needed cash. Blake Street had no drug houses. Defendant told Fritz he would see if the people there had any cocaine. Actually, he went there to discuss the furniture-moving job.

After defendant reported no success at the Blake Street address, he directed Fritz to State Street, as he might see someone who could supply cocaine. At the intersection of State and Albert, defendant saw a woman he knew. At defendant's direction, Fritz stopped the car. Defendant got out and spoke to the woman, who suggested that the two of them visit Ellen Woods' house. They did so; nobody was home. Defendant returned to the car. Fritz, without prompting, drove

to a house around the corner. Defendant knew this was a drug house, but he did not know if he could get a whole ounce of cocaine there. At Fritz's direction, defendant went to see if cocaine was available there. Receiving no answer, he returned to the car. Fritz suggested they return to 724 Concord. Defendant assented.

When the two arrived at 724 Concord, no cars were in the driveway. However, as Fritz turned his car around, he drove by Carrie Woods' van. Defendant alerted Fritz to Woods' presence and they returned to 724 Concord. Defendant exited the car and helped Woods carry groceries into the house. He also told Woods he would like to buy an ounce of cocaine. Woods said it would cost $1,800. Defendant said he had only $1,300. Woods offered to sell defendant what she could. On Woods' instruction, Fritz and defendant rode to a nearby store and soon returned.

Defendant exited the car, went into the house, and returned with 11 separate packets of cocaine that he had bought for $125 apiece. Fritz said he was dissatisfied with the merchandise and told defendant to take it back. Defendant replied that this would be impossible. Fritz was acting as though he had an "attitude," so defendant asked Fritz to drop him off at Blake Street. When they arrived there, Fritz complained about how long defendant had taken that day to find a source of cocaine. Fritz said that the next time he wanted cocaine, he would call Tennin a few days in advance. Fritz did ask defendant for his phone number, which defendant supplied and Fritz wrote down. Defendant did not hesitate to give Fritz his number, as Fritz had said it would be useful were Tennin unavailable. However, defendant never told Fritz to call him the next time Fritz wanted to get drugs in Rockford. Defendant did not know if Fritz would call again. He did not want to meet Fritz again. Defendant testified that Fritz was able to locate various drug houses without defendant's help because Tennin had shown Fritz around the city and told Fritz about these houses.

Defendant made no profit from the January 24 deal. He got no money or other compensation from either Fritz or Tennin. He never encouraged Fritz or Tennin to buy drugs from or through him. When he left Fritz at Blake Street, he did not intend to engage in any more cocaine transactions with anyone.

Fritz and several other law enforcement officers arrested defendant at defendant's house in June 1991. They ushered him out without inspecting anything in the house.

Dennis Tennin testified that he had lived in Rockford all his life. He had known defendant for 20 or 25 years. They were close friends. Tennin knew defendant trusted him. He also knew that defendant had

been addicted to cocaine. The two men had bought cocaine many times, in the course of which defendant became familiar with Rockford's drug houses. Tennin, defendant, and Rachel Lumkins had used drugs together. Tennin knew there had been sexual "advances" between Lumkins and defendant, but he was not aware that the two had actually had sex.

Tennin was paid to arrange both the January 18 introduction and the January 24 meeting. He called defendant on January 18 (he did not recall how many times) with news that his brother-in-law was in town to get cocaine and that Tennin wanted defendant to buy the drugs. Tennin never told defendant he was in debt to Carrie Woods. Defendant never told Tennin to buy the drug himself. Tennin never threatened to tell defendant's wife about defendant's relations with Lumkins. Tennin asked if defendant could procure a quarter-ounce of cocaine. Defendant replied, "you know I can" and said it would cost $350 or $400.

Later that morning, Tennin and Fritz visited defendant's house. Tennin introduced Fritz to defendant. Fritz tried to negotiate a price for a quarter-ounce of cocaine. Defendant insisted on $400. The three men visited a few houses. Defendant bought four small packages of cocaine at 724 Concord. After completing this transaction, Fritz told defendant he might want defendant's services again. Defendant quoted prices for a half-ounce or quarter-ounce of cocaine. Back at defendant's house, defendant said that the next time Fritz needed cocaine, defendant could supply it and the three men would "party."

On January 24, Tennin called defendant with news that Fritz was back to buy more cocaine and that Tennin would drive his "brother-in-law" over to defendant's house. Tennin called defendant three or four more times that morning. He told defendant that he could not make it and Fritz would come there alone.

Tennin testified that defendant sold him cocaine three or four times a week during the last three months of 1990. Tennin spent $6,000 of his retirement pension on these purchases.

The parties stipulated that defendant previously testified under oath that he had told Fritz that an ounce of cocaine would cost "around 12, 15, 13 hundred [dollars]."

Mark Fritz testified in rebuttal that, although he was long aware that Carrie Woods was nicknamed "Seal-a-meal," he never told defendant about it. On January 24, 1991, defendant told Fritz that Woods was called "Seal-a-meal."

According to Fritz, after the January 18 transaction, defendant told Fritz to contact Tennin the next time Fritz wanted drugs. Fritz

did not initially raise the subject. Fritz denied having told defendant that he knew a shortcut to 724 Concord, and he denied having told defendant to return the cocaine defendant purchased on January 24. After completing the January 24 transaction, defendant suggested that, to avoid delay the next time, Fritz should call him at the number defendant provided.

At the instructions conference, defendant's counsel tendered the IPI entrapment instruction (Illinois Pattern Jury Instructions, Criminal, No. 24—25.04 (3d ed. 1992)) and an issues instruction that stated, *inter alia*, that to obtain a conviction the State had to prove beyond a reasonable doubt that defendant was not entrapped into the January 24, 1991, transaction. The prosecutor argued that there was no evidence that defendant was not predisposed to participate in the transaction. The trial court agreed and refused to give the entrapment instruction or to include entrapment in the issues instruction. When defense counsel argued in closing that defendant had been entrapped, the prosecutor objected that the court had ruled that defendant could not use the entrapment defense. The judge instructed the jury to disregard the entrapment defense.

The jury found defendant guilty. The court denied his post-trial motion and sentenced him to eight years' imprisonment. Defendant timely appealed.

Defendant argues that the trial court erred in refusing to allow the jury to consider the entrapment defense in this case. We agree that, given the evidence, the trial court should not have taken the entrapment issue away from the jury.

A defendant is entitled to an instruction on an affirmative defense if there is even "slight evidence" to support the defense. (*People v. Wielgos* (1991), 142 Ill. 2d 133, 136; *People v. Everette* (1990), 141 Ill. 2d 147, 156.) The test is whether there is enough evidence for a rational fact finder to conclude that the State has not disproved the affirmative defense beyond a reasonable doubt. (*Everette*, 141 Ill. 2d at 156, citing *Mathews v. United States* (1988), 485 U.S. 58, 64, 99 L. Ed. 2d 54, 61, 108 S. Ct. 883, 887.) In applying this test, the court must consider the evidence in the light most favorable to the defendant. (*People v. Gannon* (1991), 213 Ill. App. 3d 560, 565; *People v. Estrada* (1980), 91 Ill. App. 3d 228, 230.) The court must not deprive the jury of its role as fact finder, and a determination that a defendant has introduced sufficient evidence of entrapment does not call for an evaluation of the witnesses' credibility, the weight to be given their testimony, or whether the State has met its burden of proof. *People v. Lindo* (1988), 169 Ill. App. 3d 877, 882; *Estrada*, 91 Ill. App. 3d 234.

Entrapment means that: (1) the concept of committing the offense originates with the State or its agent; (2) the State or its agent actively encourages the defendant to commit the offense; (3) the State's purpose is to obtain evidence for the prosecution of the defendant; and (4) the defendant is not predisposed to commit the offense. (*Wielgos*, 142 Ill. 2d at 137.) Here, the State concedes there was sufficient evidence of the first three elements. This appeal centers on whether defendant raised a jury question as to whether he was predisposed to commit the offense at issue. Viewing the evidence in the light most favorable to defendant, we conclude that he was entitled to have the jury instructed on the entrapment defense.

Factors relevant to whether a defendant was predisposed to commit a drug-related offense include the defendant's initial willingness or reluctance to commit the crime; the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users; the defendant's willingness to make a profit; his prior or current use of drugs; whether or not he had ready access to a supply of drugs; and his criminal record or lack thereof. *People v. Martin* (1991), 219 Ill. App. 3d 1064, 1076.

That a defendant committed a similar offense involving the same government agents shortly before the charged offense does not establish his predisposition to commit the second offense. The issue is whether the defendant was predisposed to commit the criminal act prior to first being approached by government agents. (*Jacobson v. United States* (1992), 503 U.S. 540, 548-49, 118 L. Ed. 2d 174, 184, 112 S. Ct. 1535, 1540-41.) Later offenses may be the product or continuation of the initial inducement of an unpredisposed person. *People v. Lindo* (1988), 169 Ill. App. 3d 877, 882; *People v. Estrada* (1980), 91 Ill. App. 3d 228, 234, relying on *Sherman v. United States* (1958), 356 U.S. 369, 374, 2 L. Ed. 2d 848, 852, 78 S. Ct. 819, 822.

Applying the *Martin* factors, we hold defendant introduced enough evidence to raise a jury question as to whether he was predisposed to commit the January 24, 1991, offense. A rational jury could have concluded that the State did not prove beyond a reasonable doubt that defendant was not entrapped.

Defendant admitted that he was a long-time narcotics user, but the evidence of his background in dealing narcotics was disputed at most. He had no record of convictions of drug-related offenses, although he had one conviction of residential burglary. The police and their paid agent initiated both the January 18 and January 24 deals, and defendant introduced some evidence that he was not interested in further dealing. It is undisputed that defendant sold no drugs to Fritz

(or, it would appear, anyone else) from his own house. According to defendant, the police did not act as though they would find drugs at defendant's house when they arrested him. When Tennin and Fritz asked him to obtain drugs, defendant needed to find a source.

Furthermore, there is evidence that Tennin used considerable mental coercion to overcome defendant's reluctance to become reinvolved in the drug world. Tennin and defendant were close friends. They testified conflictingly about whether Tennin blackmailed defendant into agreeing to the deal. The jury could infer that defendant's apparent eagerness to help Fritz was the result of his knowledge that he would pay for resisting. The jury could also infer that Tennin used coercion because he was unsure that friendship alone would persuade defendant to go along with the deal. All these issues involved credibility determinations for the jury.

Also, there was some evidence that defendant's familiarity with the Rockford drug trade was that of a long-time cocaine user rather than of a recent or regular dealer. Even assuming that defendant quoted Fritz certain prices for quantities of cocaine, it would appear that his price quotations were considerably low. Defendant knew that Woods was a major drug dealer, but he had trouble procuring drugs from several other locations.

Finally, the weight of the evidence was that defendant made no profit from either drug deal. At most, his compensation or hope of future profit was uncertain.

The cases upon which the State relies are distinguishable. In *People v. Cross* (1979), 77 Ill. 2d 396, the defendant himself testified that he initiated the criminal transaction of which he was convicted. Thus, the defendant raised no evidence that the transaction originated with the government, a necessary element of an entrapment defense.

*People v. Foreman* (1987), 153 Ill. App. 3d 346, on which the State places its greatest emphasis, involved much different circumstances from those here. In *Foreman*, the appellate court held that the trial court properly refused an entrapment instruction where the defendant was convicted of two drug-related offenses, including the delivery to a confidential informant of $82,000 worth of cocaine. Unlike the situation here, the defendant and the informant were barely acquainted and there was no evidence that the informant blackmailed the defendant into dealing in cocaine. Unlike the situation here, the defendant initiated one of the transactions. Also, the defendant made a large profit (not his first such profit) on the delivery of an immense quantity of cocaine.

The defendant in *Foreman* testified that several Colombian acquaintances threatened him with dire consequences if he refused to make the deals. The appellate court observed that this fact was relevant to the defense of compulsion but not to the entrapment defense—the reason being that the Colombians were not government agents and were not attempting to gather evidence for the prosecution of the defendant. *Foreman*, 153 Ill. App. 3d at 352-53; see *Wielgos*, 142 Ill. 2d at 136-38 (entrapment does not include actions of a private party who is not attempting to gather evidence for the prosecution of the defendant).

More similar to the case at bar than *Foreman* are *People v. Lindo* (1988), 169 Ill. App. 3d 877, and *People v. Estrada* (1980), 91 Ill. App. 3d 228. In *Lindo*, the appellate court held that the defendant was entitled to an instruction on entrapment because he had produced sufficient evidence that he was not predisposed to help an undercover informant to supply cocaine. The appellate court emphasized that a previous transaction in which the defendant assisted the informant did not conclusively establish predisposition, as a jury could find that the earlier transaction was itself the improper inducement that led an otherwise unpredisposed defendant to engage in the transaction on which the conviction was based. *Lindo*, 169 Ill. App. 3d 877.

In *Estrada*, the defendant was convicted of two counts of delivering heroin. Before he made the deliveries that formed the basis of his convictions, the defendant had made about 30 deliveries of heroin; all the transactions were made at the request of a confidential informant with whom defendant allegedly was having a "love affair." The appellate court held that the trial court erred in refusing to instruct the jury on entrapment, as a jury could find that the defendant was not predisposed to deal in drugs until he came under the influence of the informant.

Because the trial court erred in refusing to allow the jury to consider defendant's entrapment defense, the defendant's conviction is reversed and the cause is remanded for a new trial.

Reversed and remanded.

BOWMAN and QUETSCH, JJ., concur.